UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

IDANA BARBARA DECECCO,                    )
                                          )        Civil Action No. 3:11-cv-2300-CMC
            Plaintiff,                    )
                                          )
        v.                                )        OPINION AND ORDER
                                          )        ON MOTIONS FOR
UNIVERSITY OF SOUTH CAROLINA,             )        SUMMARY JUDGMENT
ERIC HYMAN, MARCY GIRTON,                 )        AND RELATED
SHELLEY SMITH, AND JAMIE SMITH,           )        EVIDENTIARY MOTIONS
                                          )
            Defendants.[1]                )
                                          )
_____   )

        This matter is before the court on two motions for summary judgment and two related

evidentiary motions.  For reasons set forth below:  (1) the motion to dismiss or for summary

judgment filed by Defendants The University of South Carolina ("USC"), USC's former Athletic

Director, Eric Hyman ("Hyman"), and USC's Deputy Athletic Director, Marcy Girton ("Girton")

(collectively "USC Defendants") is granted in full, albeit not on all grounds argued (Dkt. No. 129);

(2) Plaintiff's motion to exclude or strike declarations filed by the USC Defendants is rendered moot

by the court's disposition of the USC Defendants' dispositive motion without consideration of the

challenged evidence (Dkt. No. 133); (3) the motion to exclude Plaintiff's proffered expert on Title

IX is moot (Dkt. No. 131); and (4) the motion for summary judgment filed by Defendants Shelley

Smith and Jamie Smith[2] (collectively "Smiths" or "Smith Defendants") is granted (Dkt. No. 130).

_____

        [1]  The caption has been modified to reflect the voluntary dismissal of Defendant Harris
Pastides, President of the University of South Carolina.  *See* Dkt. No. 137.

        [2]  At all relevant times, Shelley and Jamie Smith were married and were head coach and
assistant coach, respectively, of the USC Women's Soccer Team.

## INTRODUCTION

Through this action, Plaintiff, Idana Barbara DeCecco ("Plaintiff" or "DeCecco"), seeks damages based on allegations that her USC soccer coaches, Shelley and Jamie Smith, treated DeCecco improperly including by engaging in sexual harassment. DeCecco also alleges that the USC Defendants and Coach Shelley Smith failed to take appropriate action to protect her from this mistreatment.

The USC Defendants argue, *inter alia,* that they cannot be held liable for the alleged mistreatment under any of DeCecco's legal theories due to lack of notice. All Defendants argue that DeCecco's federal claims fail because the factual record does not support a claim that the alleged sexual harassment met relevant legal standards. All Defendants also raise other legal and procedural defenses.

## STANDARD

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). Moreover, the party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Rule 56(c)(1) provides as follows:

(1)    A party asserting that a fact cannot be or is genuinely disputed must support
the assertion by:

    (A)    citing to particular parts of materials in the record, including
depositions, documents, electronically stored information, affidavits
or declarations, stipulations . . . , admissions, interrogatory answers
or other materials; or

    (b)    showing that the materials cited do not establish the absence or
presence of a genuine dispute, or that an adverse party cannot produce
admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

The opposing party "cannot create a genuine issue of material fact through mere speculation

or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment

motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

Similarly, the non-moving party cannot create a genuine issue of material fact by presenting his or

her own conflicting versions of events. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)

("A genuine issue of material fact is not created where the only issue of fact is to determine which

of the two conflicting versions of the plaintiff's testimony is correct.").

## FACTS

The facts central to the dispositive motions, taken in the light most favorable to DeCecco,

the non-moving party, are set out below.[3]

_____

    [3] In summary, DeCecco alleges that while she was a student athlete at USC, her soccer
coaches sexually harassed her and USC failed to protect her from such harassment. DeCecco's
allegations are set forth chronologically beginning with a summary of complaints from former soccer
players. DeCecco relies on these prior complaints to establish that USC had notice of her coaches'
harassment of soccer players.

**Allegations by Former Players.**  Before the events at issue in this action, a number of

female soccer players provided USC officials with complaints or negative comments regarding one

or both of the Smith Defendants.  These comments are largely in the form of exit interviews and

related communications, which are summarized below.[4]

**September 2008 Player Letter.**  DeCecco relies, most heavily, on complaints made by a

player who left the USC Women's Soccer Program before DeCecco arrived at USC.  Dkt. No. 139

at 2-4.[5]  This player's complaints are contained in a letter sent to USC's Director of Student

Financial Aid and Scholarships in September 2008 (shortly after DeCecco's arrival at USC).  Dkt.

No. 146-12.  The letter includes allegations that one or both of the Smith Defendants:  (1) promised

a four or more year scholarship (though they declined to place the promise in writing, conceding that

such a promise would violate NCAA rules) and then reneged on that promise; (2) belittled the player,

who had a learning disability, including by stating she lacked the intelligence to be a college student;

(3) discriminated against her by cutting her from the team for partying when other students with

better grades were not cut for the same behavior; (4) threatened to tell other players she did not fit

---

[4]  In arguing that DeCecco failed to give any USC official notice of any claim of sexual harassment, at least prior to July 29, 2010, the USC Defendants focus on the absence of such notice in various emails DeCecco sent to university officials complaining about her scholarship situation, limited playing time, and similar concerns.  The USC Defendants also rely on DeCecco's failure to even allude to sexual harassment in any meeting prior to July 29, 2010.  Dkt. No. 129-1 at 12-16 (facts), 19- 22 (argument).  DeCecco responds by relying primarily on reports made by players who left the program prior to her arrival.  Dkt. No. 139 at 2-5 (referring to complaints and exit interviews of players).  She also relies on her father's comments made during a July 29, 2010 meeting with various USC representatives.  *See generally* P. dep. at 100 (claiming two "reports" to USC, the first being Shelley Smith's observation "when the door opened" at the conclusion of the Locker Room Incident discussed below and the second based on the July 29, 2010 meeting).

[5]  The court refers to the departing players without naming them in order to preserve their privacy.

in if she tried to stay on the team; and (5) lied to USC officials about a phone call and then reacted harshly when her parents provided evidence allegedly showing the Smiths' statement was a lie. *See*, *e.g.*, Dkt. No. 139 at 4 (citing former player's dep. ex. 6, Sep. 26, 2008 letter to Dr. Edgar W. Miller (Dkt. No. 146-12)).

**Hyman Dep. Ex. 4.** DeCecco also relies on an exit interview dated December 15, 2006, almost two years before DeCecco's arrival at USC, in which the departing player stated that she did not "agree with all of [the coaches'] decisions and the way they go about things." That player further noted she "knew if I said stuff about [the coaches] then I'd probably never see 2 sec[onds] of playing time." Dkt. No. 146 at 4 (Hyman dep. ex. 4) (responding to inquiry whether she discussed her concerns with the Athletic Director or other administrator). Other comments indicate concerns that the "best people didn't get a chance to get on the field" and the coaches played favorites. *Id.* (responding to question no. 9).

**February 2008 Letter and Hyman Dep. Ex. 5.** DeCecco next relies on a letter from a former player to Shelley Smith written in or around February 2008, before DeCecco's arrival at USC. This letter states that "[w]e feel like we can't talk to you about Jamie because you are his wife" and "[e]veryone was scared of Jamie, . . . scared to talk to you, . . . we feared we would be punished on the soccer field." Dkt. No. 146-1 at 8 (Hyman dep. ex. 5). This player also complained of "inappropriate and unprofessional comments routinely" and that she "would personally get upset when Jamie would always make comments about the way I looked; whether it be my hair, makeup, or clothing." *Id.*[6]

---

[6] A notation on the first page of the combined exhibit (exit interview and letter) indicates Hyman did not see the letter, presumably until discovery in this litigation. Nonetheless, for purposes of this order, the court assumes without deciding that the letter was available to him and other USC officials, including Marcy Girton's predecessor, in addition to Shelley Smith to whom it was addressed.

The exit interview form for the same player, which DeCecco does not quote, indicates that the player was dissatisfied because the coaches played favorites, carried their personal lives onto the field, contradicted each other, and sometimes used foul language. Dkt. No. 146-1 at 3-4. She also complained about teasing and joking which hurt self-esteem and coaches picking on people they did not like. *Id.* at 5; *see also id.* at 6 (stating in response to question no. 1 that "Jamie needs to learn how to talk to women. Can't talk to them the same way [as males]. Matt [the other assistant coach] is a complete jerk.").

**Other Exit Interviews.** Finally, DeCecco cites generically to other exit interviews which she states "complain of improper treatment, mistreatment and/or discrimination by Defendants Jamie Smith and/or Shelley Smith [.]" Dkt. No. 139 n.2 (citing Hyman dep. exs. 2-6) (Dkt. No. 145-9 through 146-2). One of these noted a dismissed player's complaint that "I did not like Jamie using the "F" word so much," and that "[m]any of the girls think Jamie is really the Head Coach." Hyman dep. ex. 2.

**Absence of Direct Reference to Sexual Harassment.** The various exit interviews and comments suggest possible problems with the coaching staff, at least in the perception of these departing players.[7] There are, on the other hand, no direct references to any sexually harassing conduct beyond ambiguous concerns about unspecified inappropriate and unprofessional comments,

---

[7] On reply, the USC Defendants note that DeCecco relies on a "few negative comments from five of 24 exit interviews . . . from 2005 to 2012" none of which "offer evidence of sexual harassment." Dkt. No 158 at 3. The USC Defendants assert that the only suggestion of any discrimination on a legally prohibited basis was a complaint by a deaf player who was removed from a game because she could not hear the coaches' instructions. *Id.* n.2 (referring to player whose exit interview is reflected in Hyman dep. ex. 3). For purposes of this order, the court also assumes that comments about a player's intelligence (referenced in the September 2008 player letter discussed above) might fall into the same category in light of evidence that player was, at some point, diagnosed with a learning disability.

foul language, Jamie's way of talking to women, and comments by Jamie to one player about "the way I looked; whether it be my hair, makeup or clothing." Hyman dep. ex. 5.

**Recruitment Promises to DeCecco.** Prior to DeCecco's enrollment at USC, she was actively recruited by Jamie Smith who allegedly gave DeCecco's parents a personal assurance DeCecco would receive a full scholarship for all four years even though, as he disclosed, scholarships could only officially be granted on a yearly basis. Craig DeCecco affidavit ("C. DeCecco aff.") ¶10 (Dkt. No. 151-7); *see also* Idana DeCecco deposition ("P. dep.") at 153-54, 158 (Dkt. No. 129-3). DeCecco described the assurance as being that she would "be a starter and that the four-year scholarship on paper could be said to be four full years . . . because of the caliber of athlete that I was and because . . . I was an international student." P. dep. at 153. Jamie Smith allegedly told DeCecco that she "would have to do something drastically horrible or not fulfill [her] side of [the] contract" to lose the scholarship and starting position. *Id.* at 154.[8]

**Status Pre-Locker Room Incident.** DeCecco arrived at USC and began practice with the soccer team on August 1, 2008. P. dep. at 137, 144 (Dkt. No. 129-3). She did not participate in the pre-season voluntary summer workouts, which many freshmen attended, and also failed her initial physical fitness test. P. dep. 138-139, 144-45. DeCecco was frustrated that she was not receiving as much playing time as she desired, as expressed in an email she sent her mother on September 28, 2008. P. dep. at 150, Defendant's deposition exhibit ("D. ex.") 23 (complaining in strong language about other players she viewed as less skilled getting more playing time) (Dkt. No. 129-7 at 52). DeCecco's father also raised concerns regarding DeCecco's lack of playing time when he visited

---

[8] DeCecco's fraud claim is based on promises relating to redshirt status. The allegations relating to the scholarship and starting player promises are, nonetheless, relevant as they set the stage for DeCecco's later complaints regarding playing time and scholarship reduction.

USC early in the fall of 2008.  C. DeCecco aff. ¶¶ 15-17 (referring to his visit to USC in the early Fall 2008 season during which he spoke with both coaches regarding what DeCecco needed to do to get more playing time).  Both DeCecco's email to her mother and her father's visit to USC occurred before the Locker Room Incident addressed below.

**Locker Room Incident.**  After a game on October 12, 2008, Jamie Smith conveyed a message to DeCecco, through another player, to meet him in the coaches' locker room for a private conference.  P. dep. at 31-32, 35.[9]  DeCecco went to the coaches' locker room as directed.  She heard the door click (lock automatically) when Jamie Smith closed it.  P. dep. at 60.  The locking mechanism did not, however, prevent DeCecco from exiting the room or other coaches (who had keys or codes to the keypad) from entering.  *Id.* at 56-60.

Jamie Smith sat roughly six feet ("two meters") from DeCecco.  P. dep at 42-43.  He asked her "how [she] was doing, how [she] was feeling," and "just talk[ed] . . . about [her] playing time. . . . the whole time [she] was there." P. dep. at 38.  He asked "[w]hat he could do to get [DeCecco] more playing time[,] if he could talk to Shelley about it[.]" *Id.*  He also "asked how [DeCecco] was feeling, if [she] was okay, if [she] was adjusting well." *Id.*[10]

---

[9]  While the court accepts DeCecco's version of events for purposes of this order, it notes that Jamie Smith denies that he ever met alone with a player in the coaches' locker room.  *See* Jamie Smith dep. at 50 ("J.S. dep.").  Shelley Smith, likewise, denies knowledge of any such meeting.  *See* Shelley Smith dep. at 43 ("S.S. dep.") (Dkt. No. 171-4 at 5).

[10]  DeCecco conceded that Jamie Smith made no comments during the meeting which DeCecco would consider "inappropriate," and any comments he made could have been innocent.  P. dep. at 268, 337.  DeCecco, nonetheless, construed Jamie Smith's inquiries as something sexual in light of all the surrounding circumstances addressed above.  *See also id.* at 290 (asked if Jamie Smith ever took action or made comments that were "harassing because of sex or making statements that you should have sex or commenting on your looks or appearance with regard to sexual features [or] anything like that," DeCecco responded "No, not that I recall.  No.").

8

During the meeting, there were two sets of knocks at the door. P. dep at 45. DeCecco determined the person knocking was Shelley Smith during the first set of knocks when the person knocking inquired "who's in there?" *Id.* DeCecco asked Jamie Smith if they should get the door, to which he responded "don't worry about it, just listen to me." P. dep at 45. At roughly the same time as the second series of knocks, Jamie Smith touched DeCecco's leg at or near her knee. P. dep. 43-47.[11] DeCecco described her reaction at this point as "freaking out," and testified that she immediately stood up, went to the door, and opened it. P. dep. 43-47, 241.[12]

When DeCecco opened the door, Shelley Smith looked at DeCecco and asked "what the hell is going on?" P. dep at 48. As Shelley Smith entered the room, DeCecco walked out. P. dep at 48, 304. The door was then closed (DeCecco describes it as being closed in her face) after which DeCecco heard the Smiths arguing. P. dep. at 304. DeCecco was shocked by the encounter and stood by the door for about thirty seconds before walking away. P. dep. at 48, 304-05.

---

[11] It is not clear from DeCecco's deposition whether the second series of knocks was just prior to, just after, or concurrent with the touch on the knee.

[12] In her verified (sworn) complaint, DeCecco alleges that: Jamie Smith was sitting within a few feet of DeCecco throughout the meeting and leaned in so that he was just inches away and practically touching her (Dkt. No. 1 ¶ 43); she believed Jamie Smith "was clearly suggesting that if she was interested in improving her position on the team, she could do so by being sexually involved with him"; (*id*. ¶ 44); Jamie Smith first rubbed the cushion beside her leg and then rubbed her thigh during the meeting (*id*. ¶¶ 44, 48). On the other hand, her deposition testimony relates that: Jamie Smith was sitting over six feet away, at least until the end of the meeting (P. dep. at 42-43); he made no comments which she would consider "inappropriate" and any comments he made could have been innocent (*id.* at 268, 337); and he touched her once, on her knee, at which point she stood and left the meeting (*id.* at 43-44, 47). DeCecco demonstrated the touch during her video deposition, indicating a one to two second, cupped-hand touch at the top of her knee while she was seated. DeCecco's deposition testimony relating to this incident also varied from her complaint with respect to the date on which the incident occurred (October 12 versus sometime in September) and whether it occurred after a game or after practice. *Id.* ¶ 37

**DeCecco's Immediate Reaction.**  DeCecco was upset by the Locker Room Incident including Shelley Smith's reaction when DeCecco opened the door.  She called her father while walking back to her dorm to tell him about the encounter.  *See, e.g.,* P. dep. at 49; C. DeCecco aff. ¶¶ 18-22 (describing phone call and his reaction) (Dkt. No. 151-7).[13]  DeCecco told her father that Jamie Smith "touched her thigh" and that she was "creeped out just being alone with Jamie and became extremely uncomfortable and distressed when Shelley arrived outside the room." C. DeCecco aff. ¶ 20.[14]

Although upset by what his daughter relayed, Mr. DeCecco and his daughter "concluded that Shelley Smith should be responsible to report the incident, or at the very least, call a meeting to discuss the incident." *Id.* ¶ 22 (also stating that he "was very conflicted, because I was uncertain of how or with whom such problems were supposed to be addressed in the event that Shelley Smith did not take responsibility to report or investigate the incident").  There is no evidence that DeCecco or her father followed up to see if Shelley Smith made a report or took other action.  While there is no evidence of any report or corrective action, there is also no evidence that any similar incident (closed-door meeting with a male coach or arguably inappropriate touching) occurred thereafter, either to DeCecco or any other female soccer player.

**Subsequent Treatment–Limited Playing Time and Related Comments.**  DeCecco testified that, prior to the Locker Room Incident, she played a total of 362 minutes, but only played

---

[13]  Relying on DeCecco's cell phone records, the USC Defendants challenge DeCecco's claim that she called her father immediately after this meeting. Dkt. No. 129-1 at 10.  While this evidence may raise some doubts as to the accuracy of DeCecco and her father's testimony, it is not so clear as to exclude the testimony at the summary judgment stage.

[14]  Mr. DeCecco also described his daughter's reaction as feeling "violated and worried that this situation would be misconstrued in a very negative way if Shelley Smith blamed [DeCecco]" for meeting "alone with her husband."  C. DeCecco aff. ¶ 21.

ten minutes in subsequent matches, including five minutes in the match immediately following the Locker Room Incident.  P. dep at 156 (Dkt. No. 150-2).  DeCecco also testified that, on a couple of occasions in the Spring of her freshman year, Shelley Smith asked DeCecco "how can you live with yourself knowing I'm not going to play you, you're not going to play here."  P. dep. at 79, 319.

**"Dating" Inquiry.**  DeCecco also relies on an incident in which she claims Shelley Smith suggested DeCecco and another player might be engaged in a lesbian relationship.  Dkt. No. 139 at 10.  The only cited evidence is Shelley Smith's deposition testimony.[15]  According to Shelley Smith, the team captains came to her with a concern that another player had been "hanging out a lot" with DeCecco and that the two might be dating in violation of team rules.  S.S. at 50-51 (Dkt. No. 146-8 at 4-5).  Smith went to the other player and stated she "[j]ust want[ed] to make sure there's nothing going on between you and [DeCecco.]" *Id.*  The other player responded there was nothing going on and that was the end of it, at least as to Shelley Smith's involvement.  *Id.*  There is no evidence to the contrary.[16]  It is also unclear whether this incident occurred before or after the Locker Room Incident.[17]

_____

[15]  The related allegation in the verified complaint reads as follows:  "In or about October 2008, the team captains, at the direction of Coach Shelley Smith according to the captains, accused Miss DeCecco and another teammate of homosexual behavior and ordered them to no longer socialize. The accusation was false and malicious, and designed to further hurt, humiliate and alienate Miss DeCecco."  Dkt. No. 1 ¶ 69.

[16]  DeCecco has not presented any evidence contradicting Shelley Smith's description of how the issue arose or was handled.  Further, DeCecco's own testimony confirms that no coach spoke to her directly about the matter and she learned of Shelley Smith's inquiry through the other player.

[17]  At oral argument, DeCecco's counsel suggested that the verified complaint alleged that the dating inquiry was made after the Locker Room Incident.  Such an inference may be drawn from the verified complaint's allegations that the Locker Room Incident occurred in September 2008 and the dating inquiry was made in October 2008.  Dkt. No. 1 ¶¶ 37, 59.  This inference fails, however, in light of DeCecco's deposition testimony that the Locker Room Incident occurred on October 12, 2008.  This leaves only an inference that both events occurred in the same month.

**Jamie Smith Conduct Other than Locker Room Incident**.  DeCecco also relies on a few other instances of what she deemed inappropriate conduct by Jamie Smith.   Dkt. No. 139 at 9.  First, she refers to an incident prior to a game in which Jamie Smith mimed a "gangster" singer, pulling his pants down so that his boxer shorts showed ("Boxer Shorts Incident").  *See id*; P. dep. at 80-83, 312.   This incident occurred at the edge of the field before a game in the presence of the full team and public.  *Id.* (asserting that the incident was embarrassing to all of the players present).[18]

DeCecco also suggests Jamie Smith occasionally questioned other players about their sexual relationships.   Dkt. No. 139 at 9.   She refers to two instances, one in which a teammate told DeCecco:

> [S]he was in a meeting with Jamie and she felt very awkward, she felt she couldn't say anything and that she was in there with him and he was talking[,] asking her questions about her boyfriend[,] being scared that her boyfriend was going to take focus away from soccer, and that since he was in another university that he was scared she was maybe going to leave and not be as committed as she was because of her focus being skewed.

P. dep. at 83-84.

DeCecco also refers to another player telling her about a complaint made against Jamie by a former team member.  *Id.* at 84.  The only specification of what information was provided to DeCecco is a reference to earlier testimony regarding the former player whose exit interview and letter are found at Hyman Ex. 5 (discussed above).

The USC Defendants also mention a few other incidents or circumstances DeCecco referenced in her deposition as potential bases for her claim of harassment.  These include Jamie Smith cursing at practice, making condescending comments to players, and comments Jamie Smith

---

[18] This incident occurred during the fall of DeCecco's freshman year.  No more precise date is suggested.  Thus, it is unclear whether this happened before or after the Locker Room Incident.

made to trainer Stephanie Rosehart in April 2009. Dkt. No. 129-1 at 10-11. The comments to Rosehart were allegedly made in the presence of DeCecco and another player and were to the effect that it would be funny or weird to imagine a specified player and her soon-to-be fiancé fooling around or having sex because the player was so "out there" and her fiancé was so quiet. P. dep. at 69-71, 310-11.

**Redshirt Status.** During her sophomore year, DeCecco asked repeatedly for redshirt status. She claims the Smiths promised to look into redshirt status for her. C. DeCecco dep. (part II) at 12 (Dkt. No. 130-8) (testifying that Jamie Smith answered affirmatively when asked if he "promised [DeCecco] a redshirt at the beginning of [the] year."). Near the end of the season, one or both of the Smiths referred DeCecco to USC's compliance officer, Jamie Funk, who advised DeCecco that no request had ever been made and she was, at that point, ineligible for redshirt status because she had played in two games. *See* P. dep. at 248-49, 250-51, 331, D. ex. 7 (apparently a summary of events prepared by DeCecco) (Dkt. No. 129-4 at 12).

**Scholarship Reduction.** In December 2009, the Smiths advised DeCecco that her scholarship would not be continued into her junior year. P. dep. at 163-64, D. ex. 28 (letter signed December 9, 2009). In January 2010, DeCecco's mother advised DeCecco to contact the Athletic Director. P. dep. 170, D. Ex 31 (noting concerns relating to the scholarship reduction and also referring to the need to obtain redshirt status if DeCecco changed colleges).

**First Request for Meeting with Hyman.** DeCecco emailed Hyman on February 17, 2010, advising him that she was on the women's soccer team and asking for a meeting to discuss "[s]ome concerns. . . regarding her situation[.]" P. dep. at 111-12, D. ex. 14. Hyman responded that USC's policy required her to first meet with her head coach and then the sport's administrator. He noted, however, that because DeCecco indicated she had already discussed the issues with her coach, she

13

should contact Girton, the Assistant Athletic Director (apparently the relevant "sport's administrator") to set up a meeting. *Id.* Hyman also indicated that he would meet with DeCecco after she met with Girton if she still wanted a meeting with him. *Id.*

**February 2010 Meeting with Girton.** DeCecco met with Girton in February 2010. P. dep. at 150; Girton dep. at 6-7, 18-19. DeCecco's concerns, as expressed in that meeting, included "the struggle between the relationship with Shelley [Smith] and I and how we weren't communicating very well." P. dep. at 150. DeCecco also "stressed that [she] was very upset about what was going on with her scholarship." *Id.* DeCecco felt that Girton "understood that there [were] other pressing issues or there was something going on where it was not healthy" and DeCecco "was struggling with everything." *Id.* at 150-51. DeCecco did not, however, mention "the coaches' locker room incident or anything of that nature" to Girton. *Id.* at 151.

**Scholarship Modification by Shelley Smith.** In March or April 2010, after returning from a trip home, DeCecco spoke with Shelley Smith regarding her scholarship. P. dep. at 163-66 (referring to meetings with Shelley Smith in March or April during which Shelley Smith indicated she "could work something out" and was going to "crunch some numbers and see what she could do to help [DeCecco] out."); P. dep., D. ex. 29. Thereafter, in May 2010, Shelley Smith offered DeCecco a 75% scholarship for her junior year with the understanding that the scholarship would not be renewed for the following school year (2011-12). P. dep at 166, D. Exs. 29, 30.[19] DeCecco accepted and signed this offer on May 31, 2010. *Id.*

_____

[19] Beginning in late April and continuing into June 2010, DeCecco began exploring the possibility of an academic scholarship to fill the gap between what her coaches were offering and the full cost of attending USC. P. dep., D. ex. 33 (email string beginning April 27, 2010, and ending June 23, 2010, between DeCecco and Raymond Harrison).

**Appeal of Scholarship Reduction.**  Two weeks after accepting the 75% scholarship offer, DeCecco sent a letter to Dr. Edgar Miller, Director of Student Financial Aid, asking him to "look at [her] appeal process to review it."  *See* P. dep. at 178-81, D. ex. 39 (letter to Dr. Miller "request[ing] an appeal" of her scholarship reduction).  Dr. Miller contacted DeCecco within two days to answer her questions regarding the appeal process and to discuss whether she wanted to pursue an appeal.  P. dep. at 180-81, D. ex. 40.  The conversation ended with agreement DeCecco would advise Miller within a week whether she wanted to pursue her appeal.  *Id.*

The appeal was dismissed on July 15, 2010, based on DeCecco's failure to get back with Dr. Miller or take other action to pursue her appeal.  *Id.*[20]  DeCecco testified that she did not pursue the appeal because of a threat by Jamie Smith (discussed below).  *See* P. dep. at 178-81, 184.

**Threat by Jamie Smith.**  In addition to other allegations regarding the Smiths' behavior, DeCecco testified that Jamie Smith threatened her after the conclusion of her sophomore year by stating that "bad things would happen" if she appealed her scholarship reduction for the coming year.  Dkt. No. 139 at 10 (citing P. dep at 321-22).  The threat was allegedly made during a soccer summer camp held in June 2010.  P. dep at 78-79, 229-30, D. Ex 39, 61.  *See also infra* "July 29, 2010 Meeting."

**Second Request for Meeting with Hyman.**  Although she did not pursue the appeal, DeCecco did seek a further meeting with Hyman.  She requested this meeting through a July 9, 2010 email in which she stated that she and her parents wanted to meet with him "about the situation with

---

[20]  DeCecco testified that, after learning of the appeal, one or both of the Smiths advised her that she would be removed from team activities.  P. dep. at 141, 169-70, 180 (conceding Jamie Smith told her she was welcome to appeal but would not be part of the program).

15

Women's Soccer, it's very important.  If we could meet with you as soon as possible that would be great." P. dep. at 111-12, D. ex. 14 (Dkt. No. 129-7 at 3-4).

Consistent with procedures referenced in his prior email, Hyman responded that because Dececco had already met with her head coach, the next step was to meet with Girton. *Id.* He further stated that he would meet with DeCecco and her parents if they and Girton still felt it was necessary after a meeting with Girton. *Id.* A series of emails was subsequently exchanged in which DeCecco stated she had already met with Girton who advised her to work with her coaches but that she and her coaches had not "come to a workable solution." *Id.* Hyman responded with suggested meeting dates. *Id.* Hyman's assistant also exchanged emails with DeCecco regarding potential meeting dates, beginning with a July 14, 2010 email suggesting possible dates between July 22 and 30. P. dep., D. ex 14 (Dkt. No. 129-7 at 6-7).

Also on July 14, 2010, DeCecco copied Hyman and Girton on an email to the Smiths questioning why her locker had been cleaned out. P. dep., D. ex. 14 (Dkt. No. 129-7 at 5). Jamie Smith responded that he had spoken to the administration and they suggested waiting to set a meeting time until Shelley Smith returned. *Id.*

On July 27, 2010, DeCecco copied Hyman and Girton on a second email to the Smiths raising concerns regarding her status on the team. P. dep at 186, D. ex. 44. (also stating "if I am being kicked off of the team, I need to receive the promised redshirt"). DeCecco again referred to the cleaning out of her locker and noted that she was not being allowed to participate in team functions. *Id.* Girton responded within two hours, at 3:40 p.m., asking DeCecco to meet with Girton, the Smiths, Jamie Funk (USC's compliance officer), and Rob Campbell (the team's academic advisor) on July 29, 2010, at 8:15 a.m. P. dep. at 186, D. ex. 45.

16

**July 29, 2010 Meeting.** DeCecco and her father met with Girton, the Smiths, Funk, and Campbell on July 29, 2010, to discuss concerns raised in DeCecco's July 27, 2010 email. Although the email does not expressly address scholarship concerns, DeCecco and her father hoped to address increasing the scholarship from 75% to 100%. P. dep. at 100-01, 187. DeCecco and her father also planned to bring up other concerns, "near the end" of the meeting, including relating to threats, sexual harassment, and the Locker Room Incident. P. dep at 101-04.

During the meeting, DeCecco initially discussed concerns including that she "felt isolated" and was "depressed," "not having a good time," and was "upset about the scholarship." *Id.* at 105. DeCecco's father then raised several concerns including the "toxic environment," "neglect [by] Shelley [Smith]," and presence of "too much domination by Jamie [Smith]." P. dep. at 106. Mr. DeCecco then confronted Jamie Smith as to whether he had promised DeCecco redshirt status her sophomore year and whether he had threatened that bad things would happen if DeCecco appealed the scholarship decision. P. dep. at 106-07; C. Dececco dep. II at 12. Both DeCecco and her father testified that Jamie Smith conceded making the "bad things" comment. *Id.* Mr. DeCecco testified that Jamie also admitted promising redshirt status. *Id.*

At this point, Shelley Smith made a "remark about something being inappropriate." C. DeCecco dep. II at 12-14. DeCecco's father responded: "How appropriate is it for your male coach to have a closed, locked door meeting with a female athlete?" *Id.* As Mr. DeCecco characterized the response, "that's when the room erupted. . . . Girton immediately jumped up, and she had quite a raised voice and said, 'Look, if you're going to make accusations, this meeting ends now, and you don't make accusations like that without proof.'" *Id.* at 13. Mr. DeCecco offered to provide proof, Shelley and Jamie Smith both indicated they did not know what Mr. DeCecco was talking about,

and Funk asked Mr. DeCecco "would you like to make a formal complaint." *Id.* Mr. DeCecco said

he didn't know if he wanted to make a formal complaint and asked if he should. *Id.* The meeting

then, in Mr. DeCecco's words, "got quite civil again" with Girton asking what the DeCeccos "were

looking for, what we could do about the scholarship situation." *Id.* at 13-14. The remainder of the

meeting involved "talking about percentages and all that type of stuff." *Id.*; *see also* P. dep. at 107.

**Events Post-July 29, 2010.** The DeCeccos did not file any complaint or otherwise follow

up on the accusation Mr. DeCecco made in this meeting. P. dep. 107-08; C. DeCecco dep. II at 25-

26.[21] Neither did they subsequently request a meeting with Hyman. P. dep. at 110-111. Instead,

later on the day of the meeting, DeCecco decided not to remain at USC and emailed the University

of Alberta confirming that she would transfer there in the Fall. P. dep., D. ex. 13 (July 29, 2010

email to University of Alberta coach). DeCecco had applied to the University of Alberta several

months earlier. P. dep. at 110, 141.

DeCecco remained in Columbia, South Carolina (the location of the USC campus where she

attended) until August 9, 2010. There is no evidence that she had any further interaction with the

Smiths from the July 29, 2010 meeting until her departure.

After returning to Canada, DeCecco suffered emotional distress which she attributes to

events at USC. Dkt. No. 139 at 14 (citing, *e.g.*, Christopher Marusiak dep. at 40, 49, 76-77 (treating

psychologist who concluded DeCecco suffered post traumatic stress disorder which he attributed

to events she allegedly suffered at USC)). This emotional distress caused DeCecco difficulties both

---

[21] There were, however, follow up communications from Funk. P. dep. at 108, 175, D. ex. 36 (Funk August 12, 2010 email referring to several phone calls to DeCecco and her father which were not returned, a desire to "tie up lose ends," and a need to know whether DeCecco intended to attend USC in the fall); C. DeCecco dep. II at 25 (referring to subsequent telephone call from Funk).

in her academic and athletic career.  P. dep. at 191-93 (testifying that emotional difficulties contributed to her decision to redshirt her first year on the University of Alberta soccer team, then to leave the team after one year), 254-55 (noting she was in a position to be a starting player her first year at University of Alberta, but left the following year due to her mental state), 269-70 (stating that events alleged in the complaint "completely stunted" her "whole soccer career" and "whole academic plan").  DeCecco left the University of Alberta team after one year, at which point she had at least two years of eligibility to play college soccer remaining.  *Id*.  But for the denial of redshirt status at USC, she would have had three years remaining.  *Id*.

## CAUSES OF ACTION

The verified complaint asserts eight causes of action against the various Defendants.  These causes of action are summarized below.

### 1.     Title IX Claim

DeCecco's first cause of action asserts a claim for sexual harassment under 20 U.S.C. § 1681(a) ("Title IX").  Dkt. No. 1 ¶¶ 134-56.  This claim, which is asserted solely against USC, relies on allegations that USC allowed the Smith Defendants to sexually harass DeCecco by failing to investigate and address incidents of sexual harassment including but not limited to the Locker Room Incident, the Boxer Shorts Incident, and Shelley Smith's alleged adverse treatment of DeCecco.[22]

---

[22]  This claim incorporates allegations of harassment "as fully set forth in the preceding paragraphs," without further detail. Dkt. No. 1 ¶ 138.  The preceding paragraphs include verified allegations relating to (1) a private meeting between Jamie Smith and DeCecco in the viewing room (¶¶ 33-36) (DeCecco does not allege any improper comments or actions during this meeting which predated the Locker Room Incident); (2) the Locker Room Incident (¶¶ 37-57); (3) subsequent actions by Shelley Smith (ostracizing, refusing to coach, train, or give playing time, and comments referenced above) (¶ 58); (4) "false accusations of homosexuality" (¶¶ 59-61); (5) a comment by Jamie Smith to or in front of DeCecco about another player's sexual activities with her fiancé (¶ 63); (6) Jamie Smith's inquiries to other players about their private lives and relationships (¶ 64); and (7) the Boxer Shorts Incident (¶ 65).

**2.    Section 1983 Claim**

DeCecco's second cause of action asserts a claim for sexual harassment under 28 U.S.C. § 1983. Dkt. No. 1 ¶¶ 157-62.   This claim is asserted against USC and the Smith Defendants.  It alleges that the Smiths engaged in sexual harassment of DeCecco and that USC condoned and ratified that conduct through the actions (and inactions) alleged above.

**3.    Intentional Infliction of Emotional Distress**

DeCecco's third cause of action is a common law claim for intentional infliction of emotional distress ("outrage") and is asserted solely against the Smith Defendants. Dkt. No. 1 ¶¶ 163-69.   It alleges that the Smiths' sexual harassment and threatening conduct was intended to and did cause DeCecco to suffer extreme emotional distress.

**4.    Negligence (Hyman, Girton, and Smith Defendants)**

DeCecco asserts three separate negligence claims, two for simple negligence and one for gross negligence.  The first simple negligence claim (fourth cause of action) is asserted against Hyman, Girton and the Smith Defendants. Dkt. No. 1 ¶¶ 170-78.   It alleges that these Defendants knew or should have known that Jamie Smith had acted inappropriately toward players and, consequently, should be held liable for failing to protect DeCecco from the risk of harm posed by him.  This claim relies, in part, on prior complaints by players and an alleged prior directive that Jamie Smith not meet privately with players.[23]

As to both of the Smith Defendants, this claim relies on allegations of a failure to protect and of "sexual harassment or other inappropriate conduct by [both coaches.]"  Dkt. No. 1 ¶ 174.  As to

---

[23] In response to the court's request for clarification of certain points, DeCecco reiterated her position that Jamie Smith had been given an express directive not to meet privately with female players before DeCecco arrived on campus. Dkt. No. 171 at 18.  DeCecco has not, however, directed the court to any first-hand evidence that any such directive was given.

Jamie Smith, it alleges further that he "breached his duty to protect a student athlete by engaging in harassing, abusive conduct towards Miss DeCecco, as fully set forth in the preceding paragraphs." *Id.* ¶ 177.

### 5. Negligence (USC)

The second simple negligence claim (fifth cause of action) is asserted solely against USC under the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10 *et seq.*, ("SCTCA").[24]  Dkt. No. 1 ¶¶ 179-210.  The allegations are similar to those in the fourth cause of action, including allegations that:  (1) USC was aware of prior inappropriate action by Jamie Smith and had previously directed him not to meet privately with players (¶¶ 180-86) (also referring to a duty to protect players from unspecified inappropriate conduct by Shelley Smith); (2) USC failed to properly supervise the Smiths and ratified, condoned, or facilitated their improper actions by failing to take corrective measures (¶¶ 185-87); (3) USC (through Hyman) failed to exercise proper institutional controls and failed to supervise or monitor the Smith Defendants (¶¶ 188-202) (relying expressly on duties set out in the NCAA Division I Manual); and (4) USC allowed the Smiths to make knowingly false representations regarding DeCecco's redshirt status (¶¶ 203-08).

### 6. Gross Negligence

The sixth cause of action, for gross negligence, is asserted solely against USC under the SCTCA.  It rests on some of the same allegations as the fifth (negligence) cause of action against USC, specifically those involving a failure to properly supervise and control the Smith Defendants

---

[24] DeCecco does not refer to the SCTCA in her first negligence claim against Hyman, Girton and the Smith Defendants.

21

and to prevent them from harassing, abusing or retaliating against DeCecco.[25]  Thus, this cause of action is in the nature of a claim for enhanced (punitive) damages as to the fifth cause of action.

### 7. Fraud

The seventh cause of action is asserted solely against the Smiths.  It alleges fraud based on the representations regarding DeCecco's redshirt status.  Dkt. No. 1 ¶¶ 218-225.

### 8. Punitive Damages

The eighth "cause of action" is asserted against USC and the Smith Defendants.  It purports to be a separate claim for punitive damages but does not assert any legal theory distinct from those previously asserted.  Thus, in context, it seeks punitive damages based on the previously asserted claims of harassment and retaliatory conduct.  Dkt. No. 1 ¶¶ 226-231.

**Causes of Action broken down by Defendant.**  In sum, DeCecco is proceeding against USC under three distinct legal theories: violation of Title IX, violation of Section 1983, and common law negligence/gross negligence (hiring, retention, and redshirt status).  She is proceeding against Girton and Hyman under only one legal theory, common law negligence, based on an alleged failure to protect DeCecco from known risks presented by one or both of the Smiths.  Finally, she is proceeding against the Smiths under four distinct legal theories: violation of Section 1983 (sexual harassment), intentional infliction of emotional distress, negligence (failure to protect and intentional conduct), and fraud (based on alleged failed promises to seek or obtain redshirt status).

---

[25]  The specific allegations of retaliation refer to "retaliatory conduct in denying Miss DeCecco's scholarship, even after University officials were made aware that Miss DeCecco was threatened for appealing her scholarship revocation and actually retaliated against."  Dkt. No. 1 ¶ 216.

## DISCUSSION

## I.     USC DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

### A.     TITLE IX CLAIM AGAINST USC

USC argues that DeCecco's Title IX claim is barred by the statute of limitations (Dkt. No. 129-1 at 17-19) (arguing that a one-year period applies), as well as on substantive grounds (*id.* at 19-30). As to substantive grounds, USC relies on the following: (1) absence of notice to USC of the alleged sexual harassment (*id.* at 19-22); (2) absence of evidence of deliberate indifference (*id.* at 22-23); (3) insufficient evidence to establish that the alleged harassment was severe or pervasive (*id.* at 23-28); and (4) to the extent DeCecco alleges Title IX retaliation, absence of evidence that DeCecco engaged in "protected activity," at least prior to the July 29, 2010 meeting, or suffered any arguably retaliatory action after July 29, 2010 (*id.* at 28-31).

DeCecco responds arguing that her Title IX claim is timely and that she has adduced adequate evidence to support her claim. *See* Dkt. No. 139 at 16-20 (arguing for a three-year limitations period and, alternatively, that estoppel and waiver preclude USC from relying on any shorter period). As to the merits, DeCecco argues that: (1) any failure of notice from DeCecco was the result of USC's own procedures which prevented receipt of notice (*id.* at 23-26); (2) USC officials demonstrated deliberate indifference by failing to respond to DeCecco and her father's complaints (on July 29, 2010) and to prior "allegations of harassment and discrimination in [USC's] Women's Soccer Program" by other players (*id.* at 26-27); and (3) the age and power disparities between DeCecco and Jamie Smith warrant a finding of a sufficiently severe and pervasive environment of harassment to support her claim (*id.* at 27-28) (suggesting "Jamie Smith's conduct in this case is similar to the UNC Women's Soccer Coach's actions in *Jennings v. Univ. of North*

*Carolina*, 482 F.3d 686, 695 (4th Cir. 2007), and arguably worse given the physical touch during the

Locker Room Incident).  DeCecco does not address USC's arguments relating to her claim for

retaliation under Title IX, although she does refer, generically, to alleged retaliatory actions

throughout her memorandum.

### 1.    Title IX Discrimination/Harassment

#### a.    Notice

**Legal Standard.**  The court begins with the issue of notice.  As the United States Supreme

Court has explained, the notice requirement for a damages claim under Title IX differs from that

under other statutory schemes because the express statutory means of enforcement [of Title IX's

mandate] is administrative[,]" with the right to damages arising under a judicially-created "implied

private right of action." *Gebser v. Lago Vista Ind. Sch. Dist.* 524 U.S. 274, 281 (1998); *see also id.*

at 285-288 (distinguishing statutory remedies under Title VII and rejecting reliance on "principles

of *respondeat superior* or constructive notice").   In light of the nature of the private remedy, the

Court held as follows:

> [A] damages remedy will not lie under Title IX unless an official who at a minimum
> has authority to address the alleged discrimination and to institute corrective
> measures on the recipient's behalf has actual knowledge of discrimination in the
> recipient's programs and fails to adequately respond.
>
>      We think, moreover, that the response must amount to deliberate indifference
> to discrimination.  The administrative enforcement scheme presupposes that an
> official who is advised of a Title IX violation refuses to take action to bring the
> recipient into compliance.  The premise, in other words, is an official decision by the
> recipient not to remedy the violation.  That framework finds a rough parallel in the
> standard of deliberate indifference.

*Id.* at 290; *see also id.* at 292 (upholding summary judgment for school district because district could

not be "liable in damages under Title IX for a teacher's sexual harassment of a student absent actual

notice and deliberate indifference," while noting that the decision did not preclude any available state-law claim against district or teacher or a claim under Section 1983 against teacher in his individual capacity ).

As to what constitutes actual notice, the Court noted that petitioners conceded they could not satisfy the actual notice standard where:

> The only official alleged to have had information about [the offending teacher's] misconduct is the high school principal [and the information available] consisted of a complaint from parents of other students charging only that [the teacher] had made inappropriate comments during class, which was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student.

*Id.* at 291.

The court rejected reliance on the wrongdoer's own knowledge as notice to the entity. *Id.* ("Where a school district's liability rests on actual notice principles, however, the knowledge of the wrongdoer himself is not pertinent to the analysis."). It also rejected arguments based on the district's "failure to promulgate and publicize an effective policy and grievance procedure for sexual harassment claims." *Id.* ("[The school district's] failure to comply with the regulations [regarding policies and grievance procedures], however, does not establish the requisite actual notice and deliberate indifference. And in any event, the failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX.") (also noting that such regulations could be enforced administratively).[26] *Compare id. with Jennings*, 482 F.3d at 700 (finding adequate notice of coach's sexual harassment where player informed the Assistant to the Chancellor – who was also

---

[26] DeCecco concedes that *Gebser* sets the applicable standards but suggests USC's premise is faulty because, "through its own policies, practices and employees, [USC] actively prevented its receipt of notice [.]" Dkt. No. 139 at 23. This argument is addressed below. *Infra* "Inadequate Policies and Dissemination."

the university's highest ranking lawyer and an official responsible for fielding sexual harassment complaints – of concerns including by "giv[ing] vivid details of [the coach's] sexual comments about his players when the team was together").

The principles announced in *Gebser* were reiterated and reinforced the following year in *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999). There the court noted it had "rejected the use of agency principles to impute liability to [a school district] for the misconduct of its teachers" and had rejected a negligence-based "knew or should have known" standard. *Id.* at 642. Instead, a school district is liable for damages under Title IX  "only where the district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment *of which it had actual knowledge*." *Id.* (emphasis added).

Relying on *Gebser* and *Davis*, the Fourth Circuit upheld a district court's post-verdict grant of judgment as a matter of law in favor of a school district on a Title IX claim despite the fact that a school principal had constructive notice of an unreasonable risk of harm sufficient to hold him responsible under Section 1983. *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001). The court held, first, that "no rational jury could conclude that [the principal] – the relevant official for purposes of [the district's] liability under Title IX – had actual notice that [the teacher] was abusing one of his students." *Id.* at 238. Second, it held that "no rational jury could find that [the principal] was invested with the power to take corrective action on behalf of [the district]." *Id.* at 238-39. As to the second holding, the court "agree[d] with the Fifth Circuit that whether a supervisory employee may be viewed as the proxy of the school district depends upon whether the district has delegated to that employee the traditional powers of an employer, *e.g.*, the authority to hire and terminate employees." *Id.* at 249. While noting that a principal in the relevant school system "possesses substantial authority over the school to which he or she is assigned," including the duty to supervise

employees, the court concluded that the principal was not a proxy for the district because he did not have "the power to hire, fire, transfer or suspend teachers." *Id.*

**Prior Complaints (Exit Interviews).** To the extent DeCecco relies on complaints raised by other players prior to the events she challenges as discriminatory (*e.g.*, exit interviews of former players and a letter from a former player), her claims fail because, like the earlier parental complaints in *Gebser*, the complaints do not allege facts sufficient to give USC actual notice of sexual harassment. *See Gebser,* 524 U.S. at 290-91 (concluding parental complaints of inappropriate comments during class were "plainly insufficient" to alert the school district to the "possibility that [the teacher] was involved in a sexual relationship with a student"); *see also Baynard*, 268 F.3d at 238 (finding no actual notice for purposes of Title IX claim despite finding constructive notice for § 1983 claim). Instead, these documents complain about insufficient playing time, coaching style, and concerns with favoritism. At worst, this evidence suggests Jamie Smith used foul language, made unspecified inappropriate comments, had an unspecified objectionable way of talking to women, and made comments to one player about her hair, makeup or clothing. Thus, the evidence of complaints by other players does not establish actual knowledge of a sexually hostile environment.

**Notice to Shelley Smith.** To the extent DeCecco relies on notice to Shelley Smith as notice to USC, she fails to satisfy Title IX's actual notice requirement for several reasons. First, notice to Shelley Smith is not notice to USC (for Title IX purposes) because Shelley Smith had, at most, limited supervisory responsibility over Jamie Smith. *See* S.S. dep. at 28 (testifying that, although she is head coach and her husband an assistant coach, she has never been his supervisor– instead, he reports to the administration as an employee). This limited authority is not enough in light of *Gebser, Davis, and Baynard.*

Notice to Shelley Smith is also inadequate because she is one of the two alleged harassers. *See Gebser*, 524 U.S. at 291 (holding notice to the wrongdoer is not notice to the employing entity). In this regard, it is significant that the alleged loss of educational opportunities (a critical element of a Title IX claim) would not have occurred without Shelley Smith's alleged adverse reaction to the Locker Room Incident and subsequent alleged mistreatment of DeCecco, which included cutting her playing time and reducing her scholarship.

Assuming the court could isolate the actions of Jamie Smith from those of Shelley Smith and assuming that notice to Shelley Smith was otherwise adequate as notice to USC, DeCecco's Title IX claim would still fail the notice prong. This is because the only actual notice Shelley Smith is alleged to have received was of limited facts surrounding the Locker Room Incident which did not, alone, give notice of a sexually hostile environment. That is, under DeCecco's version of events, Shelley Smith learned only that a closed door meeting took place between Jamie Smith and DeCecco in the coaches' locker room from which DeCecco emerged looking upset. As there are many reasons why DeCecco might have been upset, this does not constitute actual notice of even a single incident of sexual harassment (much less one sufficiently severe to satisfy the relevant standard). There is no evidence Shelley Smith was actually aware of any touching or sexual innuendo which might have occurred during the meeting.[27]

---

[27] To the extent the allegations relating to Jamie Smith may be viewed in isolation from those relating to Shelley Smith, thus avoiding the prohibition on considering notice to the harasser as notice to the entity, DeCecco's claim would fail the causation prong because there are no allegations that Jamie Smith engaged in any similar conduct (closed door meetings, sexual innuendo, or inappropriate touching) after the Locker Room Incident. Thus, any failure to take corrective action relative to the Locker Room Incident was not a cause of further sexual harassment by Jamie Smith.

**Communications with Hyman and Girton before July 29, 2010.** To the extent DeCecco relies on her communications with Hyman and Girton before the July 29, 2010 meeting, her claims fail because she never indicated any concern relating to sexual discrimination, harassment, or a sexually hostile environment. Instead, she suggested concerns regarding insufficient playing time, scholarship status, and her interpersonal relationship with Shelley Smith. To the extent DeCecco gave notice of interpersonal relationship problems, that notice did not even hint at sexual harassment. Thus, the notice was inadequate to support a Title IX claim because it failed to give USC actual notice of any discrimination prohibited by Title IX.

**July 29, 2010.** To the extent DeCecco relies on her father's comments in the July 29, 2010 meeting, her claims fail because, while the vague comments suggested *possible* sexual discrimination or harassment (or at least circumstances presenting a heightened possibility of improper actions), neither she nor her father elected to follow up with a formal complaint despite an invitation to do so. Had they done so, they might have cured any deficiencies in the vague nature of the complaint.

Moreover, as explained below, there is no evidence that DeCecco suffered any sexual harassment, discrimination, or any other adverse treatment after the meeting given her lack of further contact with either of the Smiths and her election to pursue the remainder of her education elsewhere. Thus, even if Mr. DeCecco's comments in the July 29, 2010 meeting constituted notice of an instance of sexual harassment/hostile environment, and even if USC responded with conscience indifference, that indifference did not cause any further harm. *See infra* this section "Deliberate Indifference."

29

**Inadequate Policies and Dissemination.**  The express language of *Gebser* precludes DeCecco from relying on the absence of adequate policies or failure to publicize those policies to satisfy the notice prong.[28]  There is, in any event, no evidence that the failure of notice in this case is attributable to any inadequacies in USC's policies or its failure to publicize those policies. Instead, as explained above, it is clear that DeCecco failed to give actual notice of alleged sexual harassment or hostile environment to *any person* in a position to correct the alleged mistreatment despite repeated communications with individuals in such positions.[29]

**Requirement to Meet with Coach First**.  DeCecco also misses the mark in arguing that USC's policies prevented her from reaching the proper person with her complaint because USC required her to discuss her concerns with her alleged harasser.  Contrary to her arguments, the facts establish that Hyman did not require DeCecco to meet with her head coach after she raised concerns with him.  Instead, Hyman's emails to DeCecco stated that while USC's procedure required a player to first discuss concerns with her head coach, DeCecco had already satisfied that step and should meet next with Girton.  Hyman also made clear a willingness to meet with DeCecco after she met with Girton.  DeCecco never gave notice of *any* concern relating to sexual harassment in these email exchanges and requests for meetings, or in any meeting before July 29, 2010.

---

[28]  The challenged testimony of DeCecco's expert witness, Hogshead-Makar, relates largely to whether USC's policies were adequate and were properly implemented.  *See infra* Discussion § II. B.

[29]  Hyman, to whom DeCecco sent several emails, was clearly a person with adequate authority to receive notice for Title IX purposes.  DeCecco did not, however, mention any concern with a sexually hostile environment in any of her emails to Hyman.  For present purposes, the court also assumes without deciding that Girton was a person with sufficient authority, given that Hyman responded to DeCecco's emails by suggesting she meet with Girton.  As with Hyman, however, DeCecco did not give Girton notice of any concerns relating to sexual discrimination or harassment until the July 29, 2010 meeting, despite earlier meetings and communications.

There is no evidence that DeCecco was prevented from meeting with Girton when she sought to do so or that she was limited in the concerns she was allowed to raise. Thus, the evidence does not support any inference that DeCecco was prevented from giving notice of any sexual harassment to Girton or Hyman.

**b.    Deliberate Indifference**

The failure of notice, at least prior to July 29, 2010, precludes a finding of deliberate indifference as USC cannot have been deliberately indifferent in failing to respond to an environment of which it was unaware. Even if DeCecco and her father gave some notice of a sexually hostile environment during the July 29, 2010 meeting, she cannot establish deliberate indifference after that date because it is undisputed that those present reacted to Mr. DeCecco's vague allegations by inviting the DeCeccos to make a formal complaint. Neither did so. USC cannot have been deliberately indifferent by failing to take further action under these circumstances.

There is, in any event, no evidence that DeCecco was subjected to sexual harassment, a sexually abusive environment, or any other form of adverse treatment after July 29, 2010. Thus, even if USC's actions in failing to pursue the matter after the July 29, 2010 meeting constitute deliberate indifference, that indifference did not cause DeCecco to suffer injury covered by Title IX.

**c.    Insufficient Severity**

For reasons discussed below with respect to the Section 1983 claim against the Smith Defendants, the court also finds that the Title IX claim fails because DeCecco cannot establish that she was subjected to severe or pervasive harassment because of her gender. *See infra* Discussion § III.B.2.

### d.    Statute of Limitations

These determinations eliminate the need to resolve USC's other arguments including those based on its statute of limitations defense.   Thus, the court does not reach the issue of whether the proper limitations period is one, two or three years.   The court does, however, reject DeCecco's arguments that USC is estopped from raising or has waived its statute of limitations defense.[30]

### e.    Retaliation

To the  extent DeCecco's Title IX claim rests on alleged retaliation, it fails because she has not presented any evidence that she suffered any adverse action after engaging in protected activity. *See Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (required elements for retaliation claim are (1) that plaintiff engaged in protected activity; (2) that plaintiff suffered an adverse action; and (3) a causal link between the activity and adverse action).  The only evidence that DeCecco engaged in protected activity under Title IX is found in her father's vague reference to the Locker Room Incident during the July 29, 2010 meeting.   There is no allegation that DeCecco suffered any adverse action following that meeting.   Thus, to the extent the complaint suggests a claim for retaliation, that claim fails.[31]

---

[30] Communications and actions of USC's counsel prior to litigation do not support estoppel because USC did not encourage DeCecco's counsel to delay filing suit.  Instead, USC's counsel responded to a request for a tolling agreement by advising DeCecco's counsel to file suit if concerned about the statute of limitations. Dkt. No. 158-9.  USC also did not waive the statute of limitations defense as it was included in the Answer.  USC was not required to pursue the defense by motion prior to completion of discovery in order to preserve this defense.

[31] DeCecco does not directly address USC's motion as it relates to any claim for Title IX retaliation.  She does, however, argue that USC's failure to respond to the complaint raised in the July 29, 2010 meeting "of illegal and improper actions of Jamie Smith and the retaliation of Defendants Jamie Smith and Shelley Smith" demonstrates deliberate indifference.  This and other of DeCecco's arguments suggest that any reference to "retaliation" in the complaint was meant in a generic sense as a claim of some form of harassment or mistreatment, not as a claim that she was

**B.**    **SECTION 1983 CLAIM AGAINST USC**[32]

USC moves for dismissal or summary judgment as to the Section 1983 claim on three grounds.  First, it argues that, as an arm of the state, it is protected from liability for damages by the Eleventh Amendment.  Dkt. No. 129-1 at 31-32 (citing, *e.g.*, *Huang v. Board of Governors of the Univ of N.C.,* 902 F.2d 1134, 1138-39 (4th Cir. 1990)).  Second, it argues that it is not a "person" subject to suit under Section 1983.  *Id.* at 32 (citing, *e.g.*, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).  Finally, USC argues that the claim fails on the merits for many of the same reasons it argues the Title IX claim fails.  *Id.* at 33 (citing *Gairola v. Commw. of Va Dep't of Gen Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) (elements of a *prima facie* case under Section 1983 are the same as under Title VII); *Jennings*, 482 F.3d at 695 (case law interpreting elements of Title VII claims provides guidance for Title IX claims); *see also Baynard*, 268 F.3d at 237-38 (distinguishing notice requirements in Title VII and Title IX actions).

DeCecco challenges each of these propositions, arguing, *inter alia*, that she may pursue a claim under Section 1983 against USC and that this is her "exclusive remedy" for federally-protected rights.  These arguments are in error.

While the Section 1983 cases on which DeCecco relies involve claims against "state actors," none suggest that the claim may be asserted against an entity that is an *arm of the state.  See, e.g.,*

---

subjected to retaliation for engaging in "protected activity" (*e.g.*, reporting an alleged Title IX claim).  Deposition testimony of Hogshead-Makar supports the same interpretation.  *See* Hogshead-Maker deposition ("H-K dep.") at 81 (referring to actions by one or both of the Smiths and stating, "It is retaliation, but not retaliation under Title IX.  It . . . further shows how much power it is that the coach has over the athlete's life.").

[32]  The Section 1983 claim is asserted against USC and the Smith Defendants.  This section discusses the claim only as it relates to USC.

Dkt. No. 139 at 29 (citing *Roberson v. City of Goldsboro*, 564 F. Supp. 2d 526, 527 (E.D.N.C. 2008)).  USC is such an entity.  *See, e.g., Greer v. University of South Carolina*, 2012 WL 405773 (report and recommendation), *adopted* 2012 WL 405727 (D.S.C. 2012).  As explained in *Greer:*

> The University is an arm of the State of South Carolina. [footnote omitted] *See Maryland Stadium Auth. v. Ellerbe Becket, Inc.*, 407 F.3d 255 (4th Cir. 2005) ("Numerous courts have decided whether public state universities are 'arms of the state.' Almost universally, the answer has been in the affirmative."); *Martin v. Clemson University*, C/A No. 8:08–354–GRA, 2009 WL 2782182 (D.S.C. Aug. 28, 2009) (unpublished) (holding that Clemson University was an arm of the state entitled to Eleventh Amendment immunity); *Johnson v. South Carolina State Univ.*, C/A No. 5:09–1421–MBS, 2009 WL 1834488 (D.S.C. June 24, 2009) (unpublished) (holding that South Carolina State University was entitled to Eleventh Amendment immunity); S.C. Code Ann. § 59–101–10 (legislatively creating the University of South Carolina and other State colleges and universities); S.C. Code Ann. § 59–107–10 (including the University of South Carolina in the definition of "state institution").

*Id.* at *4. *See also Kendley v. University of South Carolina*, 2009 W.L. 5194997 (D.S.C. 2009) (identical language in a report and recommendation adopted by the undersigned).

DeCecco's suggestion that *Will* is either inapplicable or no longer good law to the extent it bars claims against the state is without merit.  *See* Dkt. No. 139 at 29 (relying on *Fitzgerald v Barnstable School Committee*, 555 U.S. 246, 256 (2009), as authorizing Section 1983 claim against state entities).  In *Fitzgerald,* the court explained certain distinctions between Title IX and Section 1983 noting that "§ 1983 equal protection claims may only be brought against individuals as well as municipalities and *certain other state entities.*"  *Id.* (emphasis added). It is this reference to "certain other state entities" on which DeCecco relies in suggesting that USC is subject to suit under Section 1983.

DeCecco's reliance is misplaced.  A careful reading of *Fitzgerald* reveals the Court's statement that "§ 1983 equal protection claims may only be brought against . . . certain other state

34

entities" referred to claims for injunctive relief brought against "military service schools and traditionally single-sex public colleges" exempt from all of Title IX's provisions.  *Id.* at 257 (noting that some activities exempted under Title IX may, nonetheless "form the basis of equal protection claims" and citing *United States v. Virginia*, 518 U.S. 515, 534 (1996) (holding men-only admissions policy at Virginia Military Institute violated the Equal Protection Clause) and *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 731 (1982) (women-only admission policy at traditionally single-sex public college violated the Equal Protection Clause)).[33]

Contrary to DeCecco's position, such language did not suggest an intent to modify longstanding interpretations of Eleventh Amendment immunity or to expand the scope of Section 1983 to claims precluded under *Will*.  *See, e.g.,  In re Secretary of Dep't of Crime Control and Public Safety*, 7 F.3d 1140, 1149 (4th Cir. 1993) (noting "it has long been settled that 42 U.S.C. § 1983 . . . does not effect . . . an abrogation" of a state's immunity under the Eleventh Amendment). Indeed, the Court again relied on *Will*, after its opinion in *Fitzgerald* was issued, noting that a plaintiff could not seek damages against a state under Section 1983, even when the state waived sovereign immunity, because "a state is not a 'person' under § 1983." *Haywood v. Drown*, 556 U.S. 729, 734 n. 4 (2009).

---

[33]   The Court also noted, in explaining the quoted language's reference to "municipalities," that "[a] plaintiff stating a similar [to Title IX] claim via § 1983 for violation of the Equal Protection Clause by a school district or other municipal entity must show that the harassment was the result of municipal custom, policy, or practice."  *Id.*  (citing *Monnell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 694 (1978).

In sum, USC is entitled to dismissal of the Section 1983 claim both under the Eleventh Amendment and because it is not a "person" subject to suit for damages under the statute. This determination makes it unnecessary to address USC's other arguments as to this claim.

### C.    NEGLIGENCE CLAIMS AGAINST USC, HYMAN AND GIRTON

DeCecco's fourth through sixth causes of action assert three separate claims for negligence. The fourth cause of action, asserted against Hyman, Girton and the Smiths, alleges negligence in the hiring, retention, and failure to properly supervise Jamie Smith. As it relates to Hyman and Girton, this claim is founded largely on allegations that they failed to respond properly to prior complaints regarding Jamie Smith and, arguably, that they failed in their duty to supervise Shelley Smith and the USC Women's Soccer Program in general.

The fifth and sixth causes of action, for negligence and gross negligence, are asserted solely against USC. Both of these causes of action rest on allegations that USC acted negligently in (1) hiring and retaining Jamie Smith, (2) failing to take corrective action when on notice of improper actions by the Smiths (alleged as "ratification"), (3) failing (through Hyman) to properly supervise or monitor USC's coaching staff or exercise proper "institutional control," and (4) allowing negligent misrepresentations to be made to DeCecco.

### 1.    Negligence and Gross Negligence Claims Against USC

**USC's Arguments.** USC argues that DeCecco's negligence and gross negligence claims against it are barred by the Eleventh Amendment. Dkt. No. 129-1 at 37 (incorporating arguments advanced with respect to 42 U.S.C. § 1983 claim against USC and negligence claim against Hyman and Girton to the extent pursued against them in their official capacities). USC also argues that the claims are (1) barred under the SCTCA to the extent founded on claims of actions outside the scope

36

of official duties or which constitute actual malice or intent to harm and (2) fail on the merits for lack of evidence of duty, breach, or proximate cause.

**DeCecco's Arguments.**    DeCecco responds that her claims are allowed under two subsections of S.C. Code Ann. § 15-78-60: subsection (17), which lists claims arising from "employee conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude"; and subsection (25), which lists claims arising from "responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, except when the responsibility or duty is exercised in a grossly negligent manner." Dkt. No. 139 at 32-33.

**SCTCA Limited Waiver of Common Law Sovereign Immunity.**    All but DeCecco's claim for gross negligence is barred by the express language of the SCTCA.  DeCecco's arguments to the contrary are based on a misreading of the relevant provision of the state statute as the listed items to which she refers are preceded by the following language:  "The governmental entity *is not liable* for a loss resulting from[.]"  S.C. Code Ann. § 15-78-60 (emphasis added).  Thus, rather than supporting her position, the inclusion of the items listed in Section 15-78-60 (15) and (25) establishes that South Carolina has expressly preserved, rather than waived, its common law sovereign immunity as to claims which fall within these categories except with respect to a gross negligence claim covered under subsection (25) (relating, *inter alia*, to protection of students).

**Eleventh Amendment Immunity.**    The SCTCA also expressly preserves the state's Eleventh Amendment immunity from suit in federal court.  S.C. Code Ann. § 15-78-20(e) ("Nothing in this chapter is construed as a waiver of the state's or political subdivision's immunity from suit in federal

37

court under the Eleventh Amendment to the Constitution of the United States[.]").  Thus, even if the SCTCA would allow DeCecco's gross negligence claim to proceed in state court, it would not allow it to proceed in federal court.

The court rejects DeCecco's various arguments that USC has waived its Eleventh Immunity defense.  First, *Lapides v. Board of Regents of the Univ. Sys. of Georgia*, 535 U.S. 613 (2002), is inapplicable because this matter was initiated in federal court by DeCecco, rather than being removed to this court by USC.  *See* Dkt. No. 139 at 21 (noting *Lapides* held voluntary removal of case to federal court waived Eleventh Amendment immunity and arguing that extension of *Lapides* supports a finding of waiver in this action).  Neither does any other action by USC in its defense of this matter support a finding of waiver, particularly given that USC gave notice of an Eleventh Amendment immunity defense in its Answer.  As with the statute of limitations defense, USC was not obligated to raise this defense by motion at any earlier point in the proceedings.  *See generally Alabama v. Pugh*, 438 U.S. 781, 782 n.1 (1978) (noting jurisdictional nature of defense, which allows it to be raised at any time); *Constantine v. Rectors & Visitors of George Mason University*, 411 F.3d 474, 481 (4th Cir. 2005) (noting that Eleventh Amendment may be asserted at any time in the litigation, even though it may be waived by certain actions).[34]

**Conclusion as to Negligence Claim against USC.**  In sum, all of DeCecco's negligence claims against USC are barred by the Eleventh Amendment.  In addition, all but her gross negligence claim (to the extent it covers actions falling within SC. Code §15-78-70 (25)) are barred by the state's common law sovereign immunity as preserved by the SCTCA.

---

[34]  DeCecco does not offer any authority for the proposition that Eleventh Amendment immunity may be waived, despite being asserted as an affirmative defense in the Answer, by waiting until the close of discovery to seek a ruling on its application.

## 2.    Negligence Claim against Hyman and Girton

**Immunity.**  Hyman and Girton argue that they are entitled to immunity under the Eleventh Amendment because they are sued in their official capacity.  *See* Dkt. No. 129-1 at 33 (arguing that facts alleged as well as failure to specify that they are sued in their individual capacity supports a finding that they are sued in their official capacity).   They further argue that suit against them would be barred under the SCTCA if they were sued in their individual capacities, because the allegations are only of acts within the scope of their official duties and do not suggest that they acted with actual fraud, actual malice, intent to harm or a crime involving moral turpitude.  *See* Dkt. No. 129-1 at 34 (arguing claim is barred by immunity granted under S.C. Code Ann. §§15-78-70(a) & (b), 15-78-200).[35]

_____

[35] The relevant provisions of Section 15-78-70 read as follows:

(a) This chapter constitutes the exclusive remedy for any tort committed by an employee of a governmental entity. An employee of a governmental entity who commits a tort while acting within the scope of his official duty is not liable therefor except as expressly provided for in subsection (b).

(b) Nothing in this chapter may be construed to give an employee of a governmental entity immunity from suit and liability if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude.

S.C. Code Ann. § 15-78-70 (a), (b).  *See also* S.C. Code Ann. § 15-78-200 ("Notwithstanding any provision of law, [the SCTCA] is the exclusive and sole remedy for any tort committed by an employee of a governmental entity while acting within the scope of the employee's official duty. The provisions of this chapter establish limitations on and exemptions to the liability of the governmental entity and must be liberally construed in favor of limiting the liability of the governmental entity.").

39

DeCecco does not directly address Girton and Hyman's Eleventh Amendment immunity argument other than by disavowing that they are sued in their official capacities. Dkt. No. 139 at 21-22. DeCecco further argues that the individual capacity negligence claim against these Defendants is not barred by the SCTCA because these Defendants' actions were outside the scope of their official duties. Her arguments, like her allegations, however, focus on alleged errors in the performance of their duties, not actions outside the scope of their duties.

**Official Capacity.** As noted above, DeCecco has abandoned any claim against Hyman and Girton in their official capacities. Had she not done so, the court would have been compelled to rule in favor of the USC Defendants on this point. *See*, *e.g.*, *Nivens v. Gilchrist*, 444 F.3d 237, 249 (4th Cir. 2006) (state official sued in his official capacity is immune from suit under the Eleventh Amendment); S.C. Code Ann. § 15-78-20(e) (preserving Eleventh Amendment immunity as to claims filed under the SCTCA in federal court).

**Individual Capacity.** These Defendants are also entitled to immunity in their individual capacity under the terms of the SCTCA because the actions complained of were all within the scope of their official duties and neither the allegations nor evidence suggest that either Hyman or Girton took any action which would fall within the listed exceptions. *Flateau v. Harrelson*, 584 S.E.2d 413, 417-18 (S.C. Ct. App. 2003) ("The statutory dialectic [of the SCTCA] reveals that a governmental employee acting within the scope of official duty is exempt from personal liability. . . . 'When a plaintiff claims an employee of a state agency acted negligently in the performance of his job, the [SCTCA] requires a plaintiff to sue the agency for which the employee works, rather than suing the employee directly.'") (internal citation omitted); S.C. Code § 15-78-10(a), (b) (quoted *supra* n. 35).

DeCecco's characterization of her allegations against Girton and Hyman as fitting within the exceptions to immunity is without support. Nothing these Defendants are alleged to have done involved anything other than performance of their official duties.[36] Neither is there any evidence that these Defendants acted with "actual fraud, actual malice, intent to harm, or a crime involving moral turpitude," which would also cause the claim against them to fall outside the scope of SCTCA immunity.[37] Thus, these Defendants are immune from suit in their individual capacity.

---

[36] DeCecco argues, for example, that "Girton's refusal and failure to follow up on reports of illegal or improper misconduct; forwarding the allegations or reports to the appropriate University personnel or office; and ignoring serious complaints about coaches for a sport she supervised fall far outside the course and scope of her employment." Dkt. No. 139 at 31. These allegations are nothing more than allegations that Girton failed to perform her duties properly. Indeed, the only potential source suggested for any duty running form Girton to DeCecco is as a consequence of Girton's duties to "overs[ee] the University's Soccer Program[.]" *Id.* It follows that they are not allegations that Girton acted outside the scope of her employment. The allegations relating to Hyman are largely the same and fail for the same reason.

[37] DeCecco argues in a footnote that the exception from immunity for such conduct would apply because:

> Hyman and Girton both participated in and implicitly aided and abetted in harassment and discrimination of Miss DeCecco. Coach Jamie Smith's unwanted touching of Miss DeCecco's leg while alone with her in a locked room, and sexual innuendo that her cooperation with him could earn her more playing time, violated generally accepted moral and societal sentiments and standards of behavior and are or should be considered crimes involving moral turpitude.

Dkt. No. 139 at 32 n. 16. DeCecco also alleges that Hyman and Girton aided and abetted fraud committed by her coaches because they required her to meet with the coaches first and then failed to intervene to prevent reduction of her scholarship. Even applying a constructive notice standard, which the court presumes for present purposes applies to the negligence claim, there is no evidence that these Defendants were aware of any alleged touching or sexual innuendo, even after Girton received some notice that a closed-door meeting had occurred (which notice was not given until July 29, 2010). To the extent DeCecco suggests these Defendants aided and abetted fraud by failing to prevent reduction of her scholarship, her argument also fails for several reasons including that: (1) the fraud alleged in the complaint does not relate to the scholarship promise; (2) neither does it allege participation by these Defendants; and (3) allegations of aiding and abetting fraud are irrelevant to the claim for negligence asserted against Hyman and Girton.

**Merits.** The USC Defendants also argue that neither Hyman nor Girton owed DeCecco a personal duty of care. *See* Dkt. No. 129-1 at 36.[38] Even assuming a duty existed, Hyman and Girton argue that there was no breach because neither received a report which would have required them to take further action to protect DeCecco, at least prior to the July 29, 2010 meeting. As DeCecco does not allege that she was subjected to any further mistreatment after the meeting, these Defendants argue that any negligent failure to follow up on comments made during the July 29, 2010 meeting could not have caused DeCecco further harm.

In response, DeCecco asserts that she "is not required to reassert any applicable duty" because the SCTCA provides that "[l]iability for acts or omissions under this chapter is based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." Dkt. No. 139 at 33 quoting S.C. Code Ann. § 15-78-20(a). She then argues that these Defendants violated the duty created by the SCTCA by failing to take proper action in response to complaints about Jamie and Shelley Smith prior to DeCecco's enrollment, including in response to an allegation of discrimination reported by a deaf player. Pointing to what she views as their worst offense, DeCecco states: "Most egregiously, they failed to follow up on Miss DeCecco's father's report of misconduct by Jamie Smith." *Id.* at 34. This alleged misconduct is

---

[38] These Defendants rely on the following cases for the absence of duty: *Andrade v. Johnson*, 588 S.E.2d 588, 592 (S.C. 2003) ("In a negligence action, a plaintiff must show the . . . defendant owes a duty of care to the plaintiff[.]"); *Marley*, 2010 WL 3852244, *16 ("Plaintiff fails to establish a [tort] claim . . . because she has not identified what duty of care was owed to her by Defendants [U.S.C. employees]."); *Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 714-15 (S.C. 2003) (finding no duty of care from university to student); *McFadyen v. Duke University*, 786 F. Supp. 2d 887, 995-98 (M.D.N.C. 2011) (concluding that the university-student relationship did not give rise to a duty of care toward lacrosse team members) *rev'd in part on other grounds sub nom Evans v. Chalmers,* __ F.3d __, 2012 WL 6554846 (4th Cir. December 17, 2012) (reversing denial of certain aspects of the motion to dismiss based on immunity).

42

described as including: "the Coaches' Locker Room Incident, threats that 'bad things would happen' [if DeCecco pursued an appeal,] and failure to secure a redshirt for Miss DeCecco." *Id.* (also referring to a "blanket refusal to meet, communicate, be receptive, and investigate Miss DeCecco's claims").

**Failure to Identify Source of Duty.** DeCecco's argument fails, in the first instance, because she declines to identify the source of any duty. The SCTCA's incorporation of common law standards and duties does not, as DeCecco claims, create any duty. It merely provides her with the source from which to draw the duty: South Carolina common law. Having failed to direct the court to any source for a relevant duty, her negligence claim fails on the first element.

**Absence of Evidence of Breach.** Even if the court were to assume some implicit duty owed by university officials to future students to follow up on allegations of serious misbehavior received from prior students, DeCecco's claims would fail. To the extent she relies on notice given through prior exit interviews and a related letter, her claim fails because the prior complaints either did not relate to the type of conduct of which DeCecco complains or because she has failed to present any support for the implicit proposition that the complained-of conduct was sufficiently specific and inappropriate to impose a common law duty on university officials to take corrective action.[39] For example, even if the coaches' action in taking a deaf player off the field was improper and legally

---

[39] For these purposes, the court gives DeCecco the benefit of an assumption that a university official with supervisory responsibility over a coach has a duty to protect students from injurious conduct by that coach if the conduct would amount to a tort and the official has notice of the propensity of the employee to commit the tort. The court will not, however, assume for present purposes that such an official has a duty to protect students from coaching behavior which would not, in itself, be legally actionable such as poor communication or coaching skills, rude or boorish behavior, or discretionary decisions such as who to play, unless the decision is motivated by a legally prohibited consideration such as race or gender.

actionable, there is no suggestion that DeCecco was removed from a game (or had her play limited) for any similar reason. Thus, a proper response to the deaf player's complaint would not have prevented the alleged harassment of which DeCecco complains.

To the extent DeCecco argues that the negligence was Girton and Hyman's failure to investigate allegations made during the July 29, 2010 meeting, her claim fails because she has failed to identify any injury which she suffered after this date as a result of the failure to investigate. Further, to the extent DeCecco's claim is based on a failure to investigate her allegations regarding the Locker Room Incident, her claim fails because she and her father failed to make a specific allegation or to ask for any such investigation after being invited to make a formal complaint.

Finally, DeCecco's allegations that Hyman and Girton engaged in a "blanket refusal to meet, communicate, be receptive, and investigate [her] claims" or refused to meet with her "until she faced her harasser" are wholly unsupported by the record. In each of the two relevant emails from Hyman, he noted that the practice was to require a player to speak first with her coaches but he also noted that DeCecco had already satisfied that step. DeCecco did not, in any event, advise Hyman or Girton that she had any complaint regarding sexual harassment, fraud, or any other legally actionable conduct until the July 29, 2010 meeting (if at all). Her father's reference during that meeting to the Locker Room Incident did not suggest touching or sexual innuendo. Despite the absence of such detail, Mr. DeCecco's comment drew an invitation to file a formal complaint. This reaction does not suggest a blanket refusal to meet, communicate, be receptive or investigate once even an allusion to sexual harassment was made.

**D.**    **PUNITIVE DAMAGES CLAIM AGAINST USC**

DeCecco's last cause of action for punitive damages (asserted against USC and the Smith Defendants) does not advance any independent legal theory of relief. Instead, it seeks punitive damages based on legal theories previously advanced, with added allegations relevant to an award of punitive damages under one or more of those theories. It follows that USC is entitled to summary judgment on this claim in light of the disposition of all other claims asserted against it.

**E.**    **CONCLUSION AS TO USC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

For the reasons set forth above, the USC Defendants' motion for summary judgment is granted in full on the following grounds: (1) USC is entitled to summary judgment on the merits of the Title IX harassment claim due to the absence of evidence of notice (at least prior to July 29, 2010), deliberate indifference (after receipt of notice), sufficiently severe harassment because of gender, or protected activity (as to retaliation claim); (2) USC is entitled to dismissal of the Section 1983 claim based on Eleventh Amendment immunity and, in the alternative, summary judgment because USC is not a "person" subject to suit under Section 1983; (3) USC is entitled to dismissal of the negligence and gross negligence claims based on Eleventh Amendment immunity and, in the alternative (except as to the gross negligence claim), based on common law sovereign immunity as preserved under the SCTCA; (4) USC is entitled to summary judgment on the separate claim for punitive damages as no independent legal theory is advanced under this claim and all other claims are disposed of as summarized above; and (5) Hyman and Girton are entitled to (a) dismissal of the negligence claim asserted against them to the extent asserted in their official capacity based on Eleventh Amendment immunity, and, to the extent asserted against them in their individual capacity,

45

based on their immunity under the SCTCA and (b), in the alternative, summary judgment on the merits.

## II.     EVIDENTIARY MOTIONS

### A.     DECECCO'S MOTION TO STRIKE DECLARATIONS

The court reaches its conclusion as to the USC Defendants' motion for summary judgment without consideration of the declarations of former players.  DeCecco's challenge to the admissibility of these declarations is, therefore, moot. Dkt. No. 133 (arguing that these declarations are inadmissible because of procedural deficiencies including that they are not sworn in the presence of a notary, fail to certify all required matters, are unreliable, and include impermissible legal conclusions).

### B.     USC DEFENDANTS' MOTION TO EXCLUDE DECECCO'S TITLE IX EXPERT, PROFESSOR HOGSHEAD-MAKAR

DeCecco offers Professor Hogshead-Makar as an expert on Title IX.  Hogshead-Makar August 17, 2012 Report ("H-M Report") at 2.  Hogshead-Makar opines, *inter alia*, that USC either had inadequate policies for the reporting of sexual harassment or failed to implement those policies adequately or both.  H-M Report at 5-7; H-M dep. at 86-88.  She also opines that various USC employees or officials failed to take proper action when they received notice of certain complaints or events.  H-M Report at 6-7 (noting, *inter alia*, that Shelley Smith failed to follow policy when she failed to report a September 2008 incident – presumably referring to the October 2008 Locker Room Incident – and participants in the July 29, 2010 meeting with DeCecco and her father failed to follow through with an investigation).  Although Hogshead-Makar does not offer any express opinion on the adequacy of any specific notice, the court assumes for present purposes that her opinion is meant

46

to support the conclusion that both Shelley Smith's knowledge of circumstances surrounding the Locker Room Incident (in October 2008) and DeCecco's father's comments in the July 29, 2010 meeting gave USC actual knowledge of sexual harassment or a hostile environment.

USC seeks to exclude all of Hogshead-Makar's opinions. USC argues that these opinions are inadmissible legal opinions, irrelevant, and lacking in adequate foundation. Dkt. No. 131.

In considering the USC Defendants' motion for summary judgment, the court has viewed Hogshead-Makar's opinions (like all other evidence) in the light most favorable to DeCecco. The court has not, however, deferred to Hogshead-Makar as to interpretations of the law. Having done so, for reasons explained above (*supra* Discussion § I.A.), the court has concluded that neither Shelley Smith's observations surrounding the October 2008 Locker Room Incident nor Mr. DeCecco's vague allegations during the July 29, 2010 meeting gave USC actual knowledge of sexual harassment or a sexually hostile environment. The court has likewise found the other claimed bases for notice inadequate.[40]

Thus, while the court has considered Hogshead-Makar's opinions, it either finds her opinions legally or factually unsupported (to the extent contrary to the rulings above) or irrelevant to the basis on which the court has granted USC summary judgment on the Title IX claim. This ruling renders USC's motion moot as there remains no claim on which Hogshead-Makar might offer an opinion.

---

[40] As noted in the discussion of the Title IX claim, actual notice cannot be established by showing deficiencies in policies or their dissemination. *See supra* Discussion § I.A. (discussing *Gebser,* 524 U.S. at 291). Hogshead-Makar's opinions as to the adequacies of USC's policies or their dissemination are, therefore, irrelevant to the grounds on which the court has granted USC's motion for summary judgment on the Title IX claim.

### III.    SMITH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As noted above, DeCecco asserts five causes of action against the Smith Defendants.  Four of these causes of action assert distinct legal theories:  violation of 42 U.S.C. § 1983 (sexual harassment); intentional infliction of emotional distress; negligence; and fraud.   The fifth cause of action seeks punitive damages without asserting a legal theory of relief.   The court, therefore, construes the fifth "cause of action" against the Smiths as seeking punitive damages under one or more of the first four claims, rather than as an independent cause of action.

The Smiths move for summary judgment on each cause of action.  For the reasons set forth below, the motion is granted in full, albeit not on all grounds argued.

### A.    Scope of Claims

Because of inconsistencies between the verified complaint and certain arguments DeCecco makes in opposition to the Smiths' motion, the court begins by clarifying the scope of DeCecco's claims against these Defendants.  First, the only negligence claim asserted against the Smiths is found in the fourth cause of action which is asserted jointly against Hyman, Girton, and the Smiths.  Thus, to the extent DeCecco relies on allegations found in the fifth and sixth negligence claims (asserted solely against USC), her arguments are misplaced.  *See* Dkt. No. 150 at 22 (referring to counts four through six in opposition memorandum's heading to section on negligence).[41]

The court also disregards any suggestion that DeCecco's claims against the Smiths include a claim under Title IX as this cause of action is clearly asserted solely against USC.  *See* Dkt. No. 150 at 11, 17, 33 (referring to Title IX claim at various points as if it is asserted against the Smith

---

[41] The heading to each count of DeCecco's verified complaint expressly identifies the Defendants against whom it is asserted. Three causes of action, including the Title IX claim and two negligence claims (fifth and sixth causes of action), are asserted solely against USC.

Defendants).  Such a claim is, in any event, viable only against an entity which received federal funding subject to Title IX.  *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 257 (2009) (noting that Title IX has "consistently been interpreted as not authorizing suit against school officials, teachers, or other individuals").  Thus, even if DeCecco alleged a Title IX claim against the Smiths, it would fail as a matter of law.

DeCecco's fraud claim is, likewise, limited to the particular fraud alleged in the Complaint: misrepresentations regarding redshirt status.  Dkt. No. 1 ¶¶ 218-225.  Contrary to certain arguments in opposition to the Smiths' motion, the Complaint does not allege fraud based on representations regarding the duration of DeCecco's scholarship or whether she would be given a starting position, which were allegedly made when she was recruited for USC's soccer team.  *Compare* Dkt. No. 1 ¶¶ 218-225 (fraud allegations) *with* Dkt. No. 150 at 31 (referring to scholarship promise in opposing motion for summary judgment as to fraud claim).  Such a limitation is required by the pleading rules applicable to claims for fraud.  Fed. R. Civ. P. 9(b) (requiring "circumstances constituting fraud" to be pleaded with particularity).

### B.    Section 1983 Claim against Smith Defendants

Through her second cause of action, DeCecco alleges that the Smiths and USC violated 42 U.S.C. § 1983 in their treatment of DeCecco. The court addresses this claim here only as it relates to the Smith Defendants.

#### 1.    Capacity

The complaint does not state whether the Smiths are sued in their individual or official capacity as to the Section 1983 (or any other) claim.  Capacity is, however, a critical threshold issue as it determines which immunities (Eleventh Amendment versus qualified immunity) apply.

49

In her memorandum in opposition to the Smiths' motion for summary judgment, DeCecco asserts that her claims against the Smiths are advanced both "in their individual and official capacities." Dkt. No. 150 at 10. She further appears to argue that all of her claims against these Defendants may survive in both capacities. *Id.* at 10-11. DeCecco also relies on *Biggs v. Meadows,* 66 F.3d 56, 60-61 (4th Cir. 1995), which instructs courts to consider "the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." Dkt. No. 150 at 11 (asserting that when her claims are evaluated "in light of the *Biggs* factors, some of the conduct alleged in the Complaint . . . is based on the Smith Defendants' conduct within the scope of their employment, while others [sic] fall outside.").[42]

**Official Capacity.** To the extent the Smiths are sued in their official capacity, they are one and the same with USC. *See, e.g., Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71(1989) (stating that an action against "a state official in his official capacity is not a suit against the official but rather is a suit against the official's office"). Thus, to the extent sued in their official capacity, the Smiths are entitled to the same immunity (Eleventh Amendment) as USC and are not "persons" subject to suit under Section 1983. *See supra* Discussion § I.B.

In her memorandum in opposition to the Smiths' motion for summary judgment, and despite her discussion of *Biggs,* DeCecco affirmatively asserts that she is proceeding against the Smiths in their official capacity as to her Section 1983 claim. The court inquired as to this issue at oral

---

[42] This statement, like certain other aspects of DeCecco's argument relating to capacity, mixes concepts relevant to Eleventh Amendment immunity (official vs. individual capacity) with those relevant to immunity under the SCTCA (scope of employment). Further, while she states that some of the Smith Defendants' actions were taken within their "scope of employment" and others were not, she fails to specify which fall within or without the relevant category (whether characterized as scope of employment or capacity).

argument, at which point counsel for DeCecco indicated that she intended to proceed against the Smiths in both their official and individual capacities as to the Section 1983 claim. Any official capacity claim fails for reasons discussed above. The court, therefore, considers whether DeCecco's Section 1983 claim may be construed as an individual capacity claim.

**Individual Capacity.** The factors listed in *Biggs* support finding that DeCecco's Section 1983 claim is pursued against the Smiths, at least in part, in their individual capacities. First, the allegations suggest the alleged improper actions were based on personal motivations distinct from any employment-linked motivation. For example, if Jamie Smith was seeking sexual favors in exchange for playing time, the motivation would be entirely personal. Similarly, if Shelley Smith's alleged mistreatment of DeCecco arose out of jealousy or anger that DeCecco had met privately with Jamie Smith, then her motivation would also be personal. The fact that these Defendants are immune from suit if sued in their official capacity also suggests that the claims should be construed as being asserted against them in their individual capacity. Finally, the Smiths have asserted a qualified immunity defense and advance that defense in their reply in support of summary judgment. Such a defense may be asserted solely in a party's individual capacity and, therefore, suggests an understanding that they were sued, at least in part, in their individual capacity. *See generally* Dkt. No. 130-1 at 17.

### 2.    Merits Section 1983

DeCecco's Section 1983 claim against the Smiths is founded on a theory of sexual harassment. To survive on this claim, DeCecco must show that the person or persons whose actions are at issue: (1) were state actors, (2) harassed her because of her sex, and (3) the harassment was sufficiently severe or pervasive to interfere unreasonably with her educational activities. *See*

*Jennings v. University of North Carolina*, 482 F.3d 686, 701 (4th Cir. 2007) (addressing college

soccer player's Section 1983 claim against soccer coach and noting that elements are governed by

traditional Title VII jurisprudence).[43]

To satisfy the third element, DeCecco must prove both: (1) that she "subjectively perceive[d]

the environment to be abusive";  and (2) that "a reasonable person would find [the environment]

abusive."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (Title VII action).  In making the

objective determination, the fact finder considers all of the surrounding circumstances including:

(1) the relative ages and positions of the harasser and victim, (2) whether the harassment was

frequent, severe, humiliating, or physically threatening, and (3) whether the harassment effectively

deprived the victim of educational opportunities or benefits.  *Jennings,* 482 F.3d at 696; *id.* at 701

---

[43]  In various memoranda, DeCecco refers to "retaliation" or "disparate treatment."  The references to retaliation are characterizations of Shelley Smith's actions (and underlying motivation) following the alleged Locker Room Incident.  They do not refer to retaliation following protected activity and, consequently, cannot support a distinct retaliation claim.  *See Coleman v. Maryland Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010).  DeCecco's references to disparate treatment, likewise, refer to Shelley Smith's adverse treatment of DeCecco following the Locker Room Incident, which she contrasts with the alleged failure to take disciplinary or other action against Jamie Smith.  DeCecco's Section 1983 claim does not, however, allege or rely on a disparate treatment theory and cannot be construed to assert such a claim.  Even if DeCecco's complaint could be construed to assert a disparate treatment claim, that claim would fail because there is no evidence the disparate treatment was because of gender, as opposed to the different status (player versus coach) and relationships (player versus spouse) at issue. *See Platner v. Cash & Thomas Contractors, Inc.,* 908 F.2d 902, 905 (11th Cir. 1990) (female employee who was discharged based on a perceived office romance with business owner's son could not maintain a claim of disparate treatment, even though owner's son who was also an employee was not disciplined, because "the ultimate basis for [the dismissal] was not gender but simply favoritism for a close relative.  However unseemly and regrettable nepotism may be as a basis for employment decisions . . . it is clear that nepotism as such does not constitute discrimination under Title VII.") (citing *Holder v. City of Raleigh*, 867 F.2d 823, 825-26 (4th Cir. 1989), which held that "'nepotism' by itself is not actionable under a disparate treatment analysis.").

(relying on severity finding under Title IX discussion).  As the *Jennings* majority explained as to a

corresponding Title IX claim:

> Evidence of a general atmosphere of hostility toward those of the plaintiff's gender
> is considered in the examination of all the circumstances. . . .  These standards for
> judging hostility ensure that Title IX does not become a general civility code. . . .
> Simple teasing, offhand comments, and isolated incidents (unless extremely serious)
> will not amount to discrimination. . . .  Common sense, and an appropriate sensitivity
> to social context, will enable courts and juries to identify objectively hostile or
> abusive conduct.

*Id*. at 696 (internal citations, quotation and editing marks omitted).

In *Jennings*, the court found the severity and pervasiveness element satisfied both for

purposes of a Title IX claim against the university and a Section 1983 claim against the offending

coach and an administrator (based on supervisory liability).  The court did so based on consideration

of two specific instances of conduct targeting the plaintiff, Jennings, which occurred in and were

made worse by an overall hostile environment which kept all players, including Jennings, in constant

fear of individualized harassment.

The court described the overall hostile environment and Jennings' exposure and reaction to

it as follows:

> Once Jennings became a member of the UNC team, she was distressed to
> learn that [the coach] engaged in sexually charged talk in team settings. [The coach]
> bombarded players with crude questions and comments about their sexual activities
> and made comments about players' bodies that portrayed them as sexual objects.  In
> addition, [the coach] expressed (once within earshot of Jennings) his sexual fantasies
> about certain players, and he made, in plain view, inappropriate advances to another.
> This behavior on [the coach's] part occurred on a regular basis, particularly during
> team warm-up time at the beginning of practice.

*Id*. at 691; *see also id.* at 692 n.1 (noting "Jennings herself heard most of the comments . . . that [the

coach] made in front of the team"); *id.* at 693 ("Jennings sought desperately to avoid [the coach's]

questions and ridicule about her personal life.")

The two specific instances of conduct directed to Jennings included explicit inquiries regarding her sexual activities.  The court described the first incident and Jennings' reaction as follows:

> During a fall tournament in California at the end of Jennings's freshman season, [the coach] held one-on-one meetings with players in his hotel room to assess their performance for the season.  [The coach] told Jennings that she was in danger of losing her eligibility to play soccer if her grades did not improve.  In the midst of this discussion, [the coach] asked Jennings, "Who are you fucking?" . . .  She replied that it was "[n]one of his God damn business" what she did off field. . . .  As Jennings described the scene, "I was 17 when he asked me that in a dark hotel room, knee-to-knee, bed not made, sitting at one of those tiny tables." . . . She felt acutely uncomfortable.

*Id.* at 693 (citations to record omitted).  The court described the second incident as follows:

> Jennings again found herself the target of [the coach's] sexual inquiries in a warm-up session during her sophomore year.  Some of the players and [the coach] were discussing one player's weekend, called a "shag fest" by [the coach], which ended with a young man crawling out of her window.  Attention turned to Jennings, who had spent the same weekend with her boyfriend at another school.  One player asked, using Jennings's nickname, "[W]ell, what about Trim'n?" . . . The coach wanted to know whether Jennings had "the same good weekend" as the player whose weekend he had just described as a shag fest. . . . [The coach] thus encouraged the interrogation about personal sexual activity to "slide over" to Jennings for several minutes. [Jennings] felt humiliated and refused to respond.

*Id.* at 693.

The court noted that the coach "had tremendous power and influence over a player's opportunity for achievement in the soccer world" because of his stature as "the most successful women's soccer coach in U.S. college history."  *Id.* at 696.  The court then found the combination of the power and age disparity, the coach's prying into his players' personal lives, including explicit and crude inquiries into their sex lives and other actions, sufficient to support a finding of objective severity.  *Id.* (noting the coach "pried into and talked openly about his players' sex lives in a way that was disrespectful and degrading").

54

As the court explained the overall atmosphere:

[The coach's] sex-based verbal abuse permeated team settings. It is described by players as occurring frequently, often during team warm-up time, on a typical Monday afternoon (the first practice date after the weekend), or any time the team was together, whether at home or traveling. According to Jennings, two players in particular were targeted with humiliating comments or questions about their sex lives almost every day or every other day.

* * *

A jury could reasonably find that [the coach's] two incidents (the hotel room encounter being the first) of direct harassment of Jennings were more abusive in light of the general, sexually charged environment. In other words, the incidents were not isolated events, but were part of an abusive pattern that instilled fear and dread.

*Id.* at 697-99 (citations to record omitted); *see also id.* at 698 (holding that conduct satisfied the objectively hostile standard even when considered in context of an "informal, sometimes jocular, college sports team atmosphere[,]" which may include "off-color language [or conduct] that is not aimed to degrade or intimidate.").[44]

**Elements Applied.** It is undisputed that the Smiths were state actors. Thus, the only elements in dispute are whether a reasonable jury could find that (1) DeCecco was subjected to harassment based on her sex and (2) this sex-based harassment was sufficiently severe or pervasive to interfere unreasonably with her educational opportunities. In addressing these elements, the court considers the alleged instances of harassment both individually and collectively.

**DeCecco's Summary.** In her opposition to the Smiths' motion, DeCecco summarizes the alleged harassment as follows:

---

[44] The Fourth Circuit's discussion in *Jennings* indicates that it considered conduct the coach directed to other players for two purposes: first, to determine the coach's motivation; and second, to determine whether the environment was objectively hostile.

DeCecco was harassed on the basis of her sex. Defendant Jamie Smith brought her into the locked Coaches' Locker Room. While there, he touched Miss DeCecco upon her leg while conveying sexual innuendo of trading playing time for sexual favors. This coupled with his comments regarding and targeting the relationships, sex lives and appearances of women's soccer players and Defendant Shelley Smith's subsequent retaliation against Miss DeCecco (which included accusations she was a lesbian) are clear evidence Miss DeCecco was harassed on the basis of her sex.

\* \* \*

[R]easonable persons will find the actions of Defendant Jamie Smith in touching Miss DeCecco against her will and without her consent in the Coaches' Locker Room and then by telling her "bad things will happen" to her if she appeals her scholarship reduction were physically threatening. The comments and actions of Defendant Jamie Smith in making sexual comments and pulling down his pants in the presence of female players and the inquiries about Miss DeCecco's purported homosexual relationship with a teammate were repeated, severe and certainly humiliating.

Dkt. No. 150 at 15, 16; *see also id.* at 17 (arguing resulting damages as follows: "As a result of the conduct of the Smith Defendants, Miss DeCecco's full scholarship was not renewed, effectively forcing her from the University. She then transferred to a Canadian school, lost credits, and will belatedly graduate. As a result, she was denied educational opportunities and benefits."). The court addresses each of the allegations in DeCecco's summary below, first individually and then collectively.

### a.    Actions by Jamie Smith

**Locker Room Incident.** Both the first and second paragraphs quoted above refer to the Locker Room Incident, which occurred in October 2008, near the end of DeCecco's first soccer season at USC. This incident has been described variously by DeCecco. In her verified complaint, DeCecco alleged that the meeting occurred after a practice in September 2008, that Jamie Smith sat very close to her, and that he rubbed a cushion beside her leg and then rubbed and stroked her thigh. In her deposition, however, DeCecco testified that the meeting occurred after a game in October

2008, that Jamie Smith sat roughly six feet away, and that he touched her leg at or near her knee just before she stood and left the room. DeCecco's verified complaint and deposition testimony also vary with respect to Jamie Smith's comments during the meeting.[45]

DeCecco urges the court to disregard her deposition testimony, contending that defense counsel engaged in an "obvious strategy of intimidating and wearing [her] down" during her deposition. Dkt. No. 139 at 9. Defendants, in contrast, argue DeCecco's deposition testimony should control to the extent it differs from the allegations in her verified complaint because a party may not create a genuine issue of fact by presenting two conflicting versions of the facts.

For present purposes, the court will resolve this dispute only in part: concluding that DeCecco's deposition testimony relating to Jamie Smith's conduct and comments during this alleged meeting controls over any contrary allegations in the complaint. *Barwick v. Celotex Corp.*, 736 F.2d at 960 ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").[46] This incident was

---

[45] In her verified complaint, DeCecco stated that she believed the comments were "clearly suggesting that if she was interested in improving her position on the team, she could do so by being sexually involved with him[,]" but did not provide any alleged quotes. Dkt. No. 1 ¶ 44. In her deposition, she conceded that he made no overtly sexual comments and anything he did say could have been innocent.

[46] In *Barwick*, the Fourth Circuit Court of Appeals affirmed the district court's grant of summary judgment despite a post-deposition affidavit which supported plaintiff's position. The court did so, in part, because the affidavit contradicted plaintiff's deposition testimony, noting as follows: "'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Id.* (quoting *Perma Research and Dev. Co. v. Singer*, 410 F.2d 572, 578 (2d Cir. 1969)). The court has applied this rule in numerous subsequent cases, usually in disregarding a post-deposition affidavit. *See, e.g., In re Family Dollar FLSA Litigation*, 637 F.3d 508, 512-23 (4th Cir. 2011) (disregarding representative plaintiff's affidavit to the extent it was inconsistent with her deposition testimony); *Boosahda v. Providence Dane LLC,* 462 Fed. Appx. 331, 335-36 (4th Cir. 2012) (declining to allow plaintiff to rely on a definitive post-deposition declaration that he never used specific credit cards for business purposes when, during his deposition, he testified that he could not recall obtaining the credit cards and did not remember making any purchases with them).

the subject of repeated inquiry during DeCecco's video deposition, with the first discussion occurring very early in the questioning. DeCecco's responses were consistent throughout the deposition, although more detailed in some places than others. She was asked to and provided a physical demonstration of the touch relatively early in the deposition. The court has viewed this portion of the video deposition and sees no suggestion that DeCecco was coerced, intimidated, bullied, or confused. Further, while the questions may have been pointed and adversarial, DeCecco has not pointed to any inquiry which suggests overreaching or any response from DeCecco which suggests confusion. DeCecco has not, therefore, presented any evidence which might justify disregarding her own deposition testimony, which the court accepts as true for purposes of this order.[47]

That said, the following sequence of events is supported by both the verified complaint and DeCecco's deposition when viewed in the light most favorable to DeCecco. DeCecco's male assistant coach held a private meeting with her in the coaches' locker room during which he discussed issues regarding her playing time in a way that she construed as sexual innuendo, twice failed to respond to another coach's (his wife's) knocks at the door, and ultimately touched DeCecco on her leg. When DeCecco herself opened the door after the second series of knocks, the head coach addressed her angrily, stating "what the hell is going on." P. dep. at 48. DeCecco was in shock and left the area and called her father to report what had happened.

The court concludes that a reasonable jury could find that this incident was sexually motivated and both subjectively and objectively abusive (thus, an incident which could contribute

---

[47] As noted above, the Smiths deny that any such incident occurred. DeCecco's testimony is, therefore, the only source of evidence as to the alleged events.

to a finding of a sufficiently hostile environment). The subjective prong may be satisfied by DeCecco's testimony regarding her reaction. It is also supported by her father's corroborating testimony regarding DeCecco's state of mind when she called him following the incident. The objective prong may be satisfied based on: (1) the location of the meeting (a dressing room with access limited to other coaches); (2) the age and power disparity between DeCecco and her coach; (3) the failure of Jamie Smith to respond when Shelley Smith twice knocked on the door; (4) the ambiguous questions regarding whether he could do something to help DeCecco get more playing time, such as speak to Shelley Smith for her; and (5) the touch on the leg.

In concluding that a jury might find the Locker Room Incident sexually motivated and subjectively and objectively abusive, the court does not suggest that it is, alone, enough to support a claim for hostile environment. Instead, the court concludes that it is an incident which might, in combination with other incidents, support a claim that DeCecco was subjected to an environment sufficiently hostile to interfere with her educational opportunities and benefits.[48]

---

[48] The court notes here that *Jennings* did not find the single hotel-room incident, which involved an overtly sexual and clearly inappropriate reference to Jennings' sexual activities, alone sufficient to establish a hostile environment in the educational context. Instead, the environment the court found sufficient was characterized by frequent similar comments to other players both in Jennings' presence and beyond, which left Jennings and other players in constant fear of being targeted, and two inquiries directed to Jennings specifically (one in the hotel room and one in a team setting), expressly relating to Jennings' sexual activities. While many courts have noted that a single incident may be enough, few have found a single incident sufficient. Those which have tend to involve sexual assault that goes beyond mere offensive touching. *Compare Paul v. Northrop Grumman Ship Systems*, 309 Fed. Appx. 825 (5th Cir. 2009) (finding single incident in which co-worker "chested up" to female employee's breasts, then placed his arm around her waist and rubbed his pelvic region across her hips and buttocks was not enough), *with Chapman v. Carmike Cinemas*, 307 Fed. Appx. 164 (10th Cir. 2009) (finding allegations sufficient where plaintiff alleged an assistant manager "forcibly led her down the hall to another room, where he sexually assaulted her"); *see also Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (finding 12 incidents over a five month period sufficient to present "a strong claim for hostile work environment" and noting that some of the incidents, which included leg fondling and forcible kissing in addition to propositions and overtly sexual comments, "may have been severe enough to be actionable in and of themselves).

DeCecco must, therefore, point to other incidents contributing to a hostile environment to support a claim under Section 1983. In this regard, the court notes that DeCecco has not presented any evidence that she was subjected to any other closed-door meeting, arguably sexually suggestive comments, or inappropriate touching during the remainder of her time at USC. DeCecco has, on the other hand, presented evidence of other conduct by one or both of the Smiths which she argues is sufficient to support her hostile environment claim when viewed in combination. These events are discussed below.

**Boxer-Shorts Incident.** Jamie Smith's pre-game, boxer-shorts display occurred in the context of his imitation of a gangster rap singer in front of the entire team during the same season as the Locker Room Incident, although it is not clear if it occurred before or after that incident. The court accepts for present purposes that this display was inappropriate and embarrassing to the players who observed it (including DeCecco).

**Comments to or about Other Players.** DeCecco also relies on allegations that Jamie Smith made "comments regarding and targeting the relationships, sex lives and appearances of [female] soccer players." None of the comments DeCecco suggests Jamie Smith may have made come close to the type of sexually explicit comments made by the coach in *Jennings*. Instead, DeCecco refers to a few isolated and vague comments, most of which she learned of second or third-hand, such as whether a player's long-distance relationship with her boyfriend might cause her to leave the team, an inquiry DeCecco did not hear directly, but did learn of while she was a player on the team.

DeCecco's testimony also supports an inference that she was told by a teammate that a former player had complained about Jamie Smith and that Jamie Smith had been told not to meet alone with female players as a result. The specifics of what DeCecco was told and when are not

clear. Despite extensive discovery on this issue, however, there is no direct or circumstantial evidence that Jamie Smith was ever given such an instruction.

The exit interview complaints specific to Jamie Smith included assertions that: (1) players felt Jamie Smith acted as head coach; (2) players were scared of Jamie and afraid they would be punished on the soccer field if they talked to Shelley about him; (3) Jamie Smith made unspecified comments about one player's hair, makeup or clothing that upset the player; and (4) Jamie Smith did not know how to talk to women. Complaints not specific to Jamie included: (1) fear that complaints about the coaches would result in loss of playing time; (2) a belief that the best people did not get a chance to play and the coaches played favorites and picked on people they did not like; (3) a view that the coaches carried their personal lives onto the field and contradicted each other; and (4) that the coaches sometimes used foul language and engaged in teasing and joking which hurt players' self esteem.

Finally, there is evidence DeCecco and another player overheard comments Jamie Smith made to trainer Stephanie Rosehart (another USC employee) along the lines that it would be funny or weird to imagine a specified player and her soon-to-be fiancé fooling around or having sex because the player was so "out there" and her fiancé was so quiet. For present purposes, the court assumes Jamie Smith was aware of the presence of DeCecco and her teammate and their ability to overhear his comments.

While comments made to others may contribute to proving the existence of a hostile environment, the particular comments referenced here add little or no weight to DeCecco's claim of a hostile environment. This is because they are scattered over a period of two years and, with the

exception of the isolated comment to the trainer, are either not sexual or ambiguous as to sexual intent.

**"Bad Things Will Happen" Threat.** For present purposes, the court assumes a reasonable jury could find the threat that "bad things [would] happen" if DeCecco appealed her scholarship reduction was or at least could be construed as physically threatening.[49] There is, on the other hand, no suggestion that the "threat" was sexually motivated or sexual in nature. Instead, the disclosed and most obvious motivation was Jamie Smith's dissatisfaction with DeCecco's decision to appeal reduction of her scholarship.

DeCecco suggests an alternative motive by arguing that the scholarship reduction was the end game in Shelley Smith's maltreatment of DeCecco. In essence, this theory presumes that Jamie Smith's threat was motivated by his desire to support Shelley Smith's maltreatment of DeCecco, which, in turn, was motivated by Shelley Smith's negative reaction to finding DeCecco alone in the coaches' locker room with Jamie Smith. To this extent, Jamie Smith's motivation would be derivative of Shelley Smith's motivation, which is insufficient for reasons discussed below. *See infra* Discussion § III.B.2.b. "Jealousy Motive."

**Homosexual Relationship Comment.** DeCecco also refers to an inquiry as to whether she was involved in a homosexual relationship with a teammate. This inquiry was made by Shelley Smith. DeCecco has offered no evidence that Jamie Smith was involved in any way. Thus, this comment is not considered with respect to the Section 1983 claim against Jamie Smith.

---

[49] It might, on the other hand, have referred to the type of actions which did follow DeCecco's initiation of an appeal: the cleaning out of her locker and her exclusion from team activities.

**Repetition.** Contrary to DeCecco's assertion, there is no evidence that any of these alleged incidents were repeated. Only a few of the incidents were directed to or even observed by DeCecco, and several either are not attributable to Jamie Smith or cannot fairly be said to be sexually motivated, or both.

Considered alone, the allegations of actions by Jamie Smith are insufficient to support a claim that he created a sexually hostile environment which a reasonable person would find abusive or which deprived DeCecco of educational benefits. *Harris*, 510 U.S. at 21; *Jennings*, 482 F.3d at 696, 701. While this disposes of any claim based on Jamie Smith's individual actions, it does not dispose of the Section 1983 claim which is considered further below both with respect to Shelley Smith's independent actions and the combined effect of both of the Smiths' actions.

### b.    Actions by Shelley Smith.

**Inquiry Relating to Sexual Orientation.** What DeCecco characterizes as an accusation that she was a lesbian is an inquiry made by Shelley Smith in response to a request from team captains that Shelley Smith address a possible "dating" situation between players. The only evidence that such an inquiry was made is Shelley Smith's testimony that, after the captains raised the concern, she decided to speak to the other player, rather than DeCecco, because she was aware that the other player was homosexual. S.S. dep. at 50-53; *id.* at 53 (also explaining basis of concern as follows: "[T]he girls know we have no problem with them dating women. It's just within the team that's when it affects your team chemistry. . . . We want everyone to be close and get along and be together. . . . But when they cross a line then you have concerns."). Asked whether something other than friendship was going on, the other player responded negatively, which Shelley Smith accepted as true. *Id.* at 51. There is no suggestion any coach made any further inquiries or comments about

63

the situation to anyone, including DeCecco, although DeCecco made one brief comment about the inquiry to Shelley Smith. *Id.* at 55-56 (stating that DeCecco made a brief comment to Shelley Smith during a practice that she wanted to discuss her friendship with the other player, to which Shelley Smith said "okay," but DeCecco never followed up).

Assuming without deciding that a reasonable jury could find that the dating question satisfies the basic motivation requirement, that it was made because of DeCecco's gender, there remains no evidence to suggest the inquiry was made with an intent to harm, embarrass, or harass DeCecco. To the contrary, the evidence suggests only that Shelley Smith followed up on a concern raised by team captains in a manner intended to minimize any embarrassment to DeCecco (by speaking to the other player), accepted the other player's word that there was no dating relationship, and indicated a willingness to discuss the issue when DeCecco later suggested she would like to do so.

**Other Adverse Conduct by Shelley Smith.** DeCecco also proffers evidence that Shelley Smith treated DeCecco less favorably, even harshly, following the Locker Room Incident. This conduct, includes: reduction in playing time; a related inquiry how DeCecco could live with herself knowing Shelley Smith would never play her; an elimination (later changed to reduction) in scholarship after DeCecco's sophomore year; and a failure to follow through on a request for redshirt status. For present purposes, the court assumes without deciding that these actions are sufficiently severe to be both subjectively and objectively abusive and contributed, collectively, to a loss of educational opportunities and benefits.

The more difficult question is whether a reasonable jury could find Shelley Smith's motivation for any adverse treatment of DeCecco to be "because of" DeCecco's gender. Nothing in the nature of the treatment itself suggests sexual hostility (DeCecco and all other players on the

64

team were female and the alleged adverse treatment was not sexual in nature).  To the extent there

is any suggestion of sexual motivation, it is found in the alleged trigger:  Shelley Smith's reaction

to the Locker Room Incident.  For reasons set forth below, the court concludes that such a motive

does not support a claim for sexual harassment under Section 1983.

**Jealousy Motive.**  Following the court's review of the parties' earlier memoranda, the court

requested supplemental briefing on the motive element.  Most particularly, the court asked the parties

to brief whether jealousy can satisfy the motivation element of a Section 1983 gender-based

harassment/hostile environment claim (or similar claims under Title VII or Title IX).

In response, DeCecco makes several arguments as to why Shelley Smith's alleged hostile

treatment was "because of" DeCecco's gender.  *See* Dkt. No. 171 at 1-16.  Although DeCecco argues

that Shelley Smith's actual emotion is irrelevant, her arguments all circle back to some adverse

reaction by Shelley Smith to finding DeCecco alone in the coaches' locker room with Jamie Smith.[50]

> There is absolutely no evidence in the record as to whether Coach Shelley Smith was
> angry, sad, worried, or jealous.  The specific emotion Coach Shelley Smith felt is
> irrelevant.  Here, there is evidence, set forth above, that (1) Coach Shelley Smith
> would not have reacted in the same manner had she discovered Coach Jamie Smith
> alone with a male and (2) thereafter, Coach Shelley Smith began treating Miss
> DeCecco in a discriminatory and retaliatory manner.  Such evidence is sufficient for
> a jury to find Coach Shelley Smith's actions were motivated by Miss DeCecco's
> gender.

---

[50]  DeCecco also suggests that it is improper for the court to consider whether jealousy is a
sufficient motivation given that Defendants did not raise this specific concern and deny that the
incident even occurred (thus cannot argue that Shelley was jealous).  *Id.* at 2 ("Defendants cannot
now offer evidence as to how an event they claim did not occur made Coach Shelley Smith feel,
whether that emotion is jealousy, anger, resentment or any other emotion).  These arguments ignore
that DeCecco bears the burden of establishing all elements of her claim, including that the hostile
treatment was "because of her sex," and that Defendants challenge her ability to establish gender-
based motivation.

Dkt. No. 171 at 11; *see also id.* at 5-6 (arguing DeCecco has shown the alleged mistreatment by Shelley Smith would not have happened but for her gender because Jamie Smith is presumably heterosexual and, consequently, "there is absolutely no evidence that Coach Shelley Smith would be upset or jealous of Miss DeCecco for any reason other than . . . that Miss DeCecco was a woman alone with [Shelley Smith's] husband in a locked room").[51]

All parties filed supplemental memoranda addressing this issue on December 17, 2012. Dkt. Nos. 171, 172, 173. No party was able to locate any Title IX or Section 1983 case addressing the issue. All, however, found Title VII cases addressing whether actions motivated by jealousy may constitute gender-based harassment or discrimination. See Dkt. Nos. 171 at 7-15, 172 at 2-4, 173 at 3-5. With one possible exception, *Vargas-Caban v. Carribean Transportation Services*, 2005 WL 3560689 (D. Puerto Rico 2005) (cited by DeCecco), all of the cases hold that jealousy does not suffice.

In *Vargas-Caban*, the plaintiff alleged that she was subjected to sexual harassment and a gender-based hostile environment by her employer's male chief executive officer ("CEO") and his female subordinate, Nicoletti. Vargas-Caban alleged that the male CEO subjected her to unwelcome and inappropriate sexual contact "including rubbing, touching, kissing or caressing . . . which, in the

---

[51] DeCecco also appears to argue that gender-based motivation is established by evidence of disparate treatment and retaliatory conduct. These arguments do not support an inference of gender-based motivation and, in any event, misapply distinct legal theories. For example, in her supplemental brief, DeCecco argues that a "jury could infer illegal discrimination simply from the facts presented" including that "Coach Shelley Smith treated the female involved [in the Locker Room Incident] differently from the male involved [her husband], because she retaliated against the female and the male was not even disciplined." Dkt. No. 171 at 2. As explained above, however, DeCecco's claim is not one for disparate treatment. *See supra* n. 43. Similarly, to the extent DeCecco refers to "retaliation," she is using the term in a general sense as she has not presented any evidence that the alleged mistreatment by Shelley Smith occurred after DeCecco engaged in protected activity.

context described by plaintiff, may be perceived as sexually charged." Slip. Op. at 13. Vargas-Caban also alleged that her immediate supervisor, Nicoletti, treated her in a "violent[,] humiliating and demeaning manner." *Id.* Vargas-Caban suggested this treatment was motivated by jealousy due to Nicoletti's assumption that Vargas-Caban and the CEO had a sexual relationship. The court denied the employer's motion for summary judgment (on a Title VII claim) noting that, in addition to the allegations of jealousy-based motivation, Vargas-Caban alleged inappropriate sexual touching by the male CEO.

It is unclear whether the *Vargas-Caban* court considered jealousy a sufficient proxy for gender-based animus, or whether it found this potential motivation irrelevant in light of evidence of unwelcome and inappropriate touching by the CEO. *See* Slip Op. at 13 (discussing actions of CEO and Nicoletti collectively). In any event, the court did not directly address whether jealousy may suffice and any implicit conclusion as to the sufficiency of a jealousy motive is *dicta*. Under these circumstances, this court does not find *Vargas-Caban* persuasive authority supporting consideration of jealousy as sufficient motivation to support a claim of gender-based discrimination or harassment.

The remaining cases fall into two categories: cases involving sexual jealousy and cases involving some other form of jealousy, such as jealousy based on a co-worker's superior skills or opportunities. *See, e.g., Hoskins v. Napolitano*, 2012 WL 5921041, Slip Op. at 14 (D. Md. 2012) (addressing jealousy based on plaintiff's claimed "superior work experience"). While the court agrees with DeCecco that the latter category of cases are distinguishable, it does not agree that all the cases DeCecco addresses are distinguishable on this basis. *See* Dkt. No. 171 at 8-10.

For example, DeCecco argues that *Blackshear v. Interstate Brands Corp.*, 2010 WL 2045196 (S.D. Ohio) is distinguishable because the "jealousy stemmed from some factor *other than*

gender." Dkt. No. 171 at 8 (emphasis in original). While all individuals involved in the incidents at issue in *Blackshear* were female, and plaintiff conceded she could not assert a claim for sexual orientation discrimination, she argued that the harassment was gender-motivated because the mistreatment was motivated by plaintiff's relationship with someone who was the object of her supervisor's affection. *Id.* * 5. The court rejected this argument noting that the "purported mistreatment . . . was not because Plaintiff was a female but because [she] was a person (regardless of gender) who was involved in a relationship with [the object of the supervisor's affection.]" *Id.* The court explained that "[m]ere jealousy of this sort, however distasteful or immature, does not equate to discrimination, harassment, or retaliation based on gender." *Id.*

Similar circumstances were presented in *Huffman v. City of Prairie Village*, 980 F. Supp. 1192 (D. Kan. 1997) and *Bush v. Raymond Corporation, Inc.*, 954 F. Supp. 490 (N.D. N.Y. 1997). *See* Dkt. No. 171 at 10 (seeking to distinguish *Huffman* and *Bush*). For example, in *Huffman*, the court held that a female employee's claims based on actions of her female supervisor did not support a gender-based discrimination claim because the supervisor's alleged mistreatment was motivated by jealousy over plaintiff's relationship with the supervisor's boyfriend. *See Huffman*, 980 F. Supp. at 1199 (holding this motivation did not constitute gender-based discrimination). Similarly, in *Bush*, the court held gender-based motivation was not supported where plaintiff admitted her immediate supervisor was motivated by jealousy over special treatment the supervisor believed plaintiff received as a result of an assumed affair with a higher-level supervisor. *Bush*, 954 F. Supp. at 498.[52]

---

[52] Both *Huffman* and *Bush* rely on *DeCintio v. Westchester County Medical Center*, 807 F.2d 304 (2d Cir. 1986), *cert. denied*, 484 U.S. 825 (1987), which held that discrimination based on a romantic relationship between the employer and the person given preferential treatment did not constitute discrimination based on sex. Instead, to support a claim of discrimination, "[t]he proscribed distinction . . . must be based on a person's sex, not on his or her sexual affiliations." *DeCintio*, 807 F.2d at 307.

DeCecco also argues that *Evans v. Williamsburg Tech. College*, 2007 WL 1068183 (D.S.C. 2007) is distinguishable. *Evans* is, however, similar to *Huffman* and *Bush* in finding the gender-animus element not satisfied where the alleged hostile treatment was motivated not by plaintiff's gender *per se*, but by the alleged harasser's belief plaintiff was the boss's paramour.

The Eleventh Circuit Court of Appeals reached a similar conclusion in *Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 903, 905 (11th Cir. 1990) (cited by Defendants). There, the court held plaintiff had not shown gender discrimination, despite the fact she was terminated for allegedly having an affair with the owner's son while the owner's son, who was also an employee, was not disciplined. The court concluded that the difference in treatment was based on the difference in relationships (preference for a family member and desire to preserve the family in the face of the daughter-in-law's jealousy) rather than based on gender.

The court finds the cases discussed above (with the exception of *Vargas-Caban*) persuasive and concludes that alleged mistreatment motivated by a relationship or a threat to relationship is not mistreatment because of gender. In the present case, Shelley Smith's alleged mistreatment of DeCecco followed and was allegedly motivated by her reaction to finding DeCecco in the coaches' locker room with Jamie Smith. Whether this reaction is characterized as anger, jealousy, fear, or some other emotion, it is founded on the relationship between Jamie and Shelley Smith (as husband and wife, head coach and assistant coach, or both), not on DeCecco's gender *per se*. Under these circumstances, the court concludes that DeCecco cannot establish that any adverse action taken against her by Shelley Smith was because of DeCecco's gender. It follows that she cannot establish a Section 1983 claim against Shelley Smith.

### c.      Combined Actions

Given the absence of evidence that Shelley Smith's alleged mistreatment of DeCecco was because of DeCecco's gender, Shelley Smith's actions cannot be considered in combination with Jamie Smith's actions to support a claim for hostile environment. It follows, given the inadequacy of the allegations based on Jamie Smith's actions alone, that DeCecco's claim that she was subjected to a hostile environment because of her gender fails whether asserted collectively or individually against either of the Smiths.

### d.      Qualified Immunity

DeCecco's claim would fail even if the court were to find jealousy, anger, or protection of relationships a proper proxy for gender-based harassment. This is because the novelty of imposing liability on this basis supports a qualified immunity defense. *See, e.g., Gregg v. Ham*, 678 F.3d 333, 338-39 (4th Cir. 2012) (noting defense of qualified immunity involves a two-step procedure, which considers first whether a constitutional violation has occurred and second whether the right violated was clearly established); *Henry v. Purnell*, 652 F.3d 524, 534 (4th Cir. 2011) (noting that second step considers whether the contours of the right the official is alleged to have violated were sufficiently clear that the official would understand what he was doing violated that right).

As the United States Supreme Court has explained:

> [T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . ; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635 (1987); *see also Williams v. Hansen*, 326 F.3d 569, 579 (4th Cir. 2003 (applying *Anderson* in concluding, in the alternative to a favorable ruling on the merits,

70

that defendant was entitled to qualified immunity because "if judges of the United States Courts of Appeals are of the view that plaintiffs are advancing a 'right' that did not exist when allegedly infringed (and still does not exist) then the right could not have been clearly established at the time infringed."); *Lopez v. Robinson*, 914 F.2d 486, 489 (4th Cir. 1990) (applying *Anderson* in noting that "court must determine whether the actions would infringe 'particularized' rights claimed by the plaintiff").

At best, DeCecco has directed the court to a single unpublished case from the District of Puerto Rico which may support the conclusion that jealousy or some other relationship-based motive may, at least in combination with other evidence of gender-based harassment, support a claim for sexual harassment under Title VII and, by analogy, Section 1983. The weight of authority, which this court finds persuasive, goes the other way. Under these circumstances, the court cannot find that it was clearly established when DeCecco was a player at USC that her coaches would violate DeCecco's constitutional rights if they treated her adversely due to a coach's jealousy or other relationship-based motive. It follows that the Smiths would be entitled to qualified immunity even if jealousy (or a similar motive) was found to be sufficient to establish gender-based discrimination or harassment.

### e.    Supervisory Liability

In the absence of proof of the underlying claim against Jamie Smith, Shelley Smith cannot be liable under a supervisory liability claim. *See Evans v. Chalmers*, Slip. Op. No. 11-1436 at 34 (4th Cir. Dec. 17, 2012) (dismissing supervisory liability claims based on failure of the claim against the subordinate because "supervisors . . . cannot be liable under § 1983 without some predicate constitutional injury at the hands of the individual [state] officer") (internal quotation marks omitted).

### e.     Conclusion as to Section 1983

For the reasons set forth above, the court concludes that DeCecco has failed to establish a claim against either of the Smith Defendants under Section 1983.

### C.     Intentional Infliction of Emotional Distress against the Smith Defendants

DeCecco's cause of action for intentional infliction of emotional distress, also known as the tort of ourtrage, is asserted solely against the Smith Defendants.  To support a claim under this state law cause of action, DeCecco must show that (1) these Defendants intentionally or recklessly inflicted severe emotional distress on DeCecco or were certain or substantially certain that such distress would result from their conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community; (3) the Smiths' actions caused DeCecco emotional distress; and (4) the emotional distress was so severe that no reasonable person could be expected to endure it.  *Ford v. Hutson*, 276 S.E.2d 776, 781 (S.C. 1981) (adopting elements from Restatement (Second) of Torts § 46).

The claim at issue in *Ford* involved a real estate purchaser's repeated verbal harassment of his realtor over an extended period of time.  The harassment included "orally accost[ing] [the realtor] with insulting and/or profane remarks on no less than seven different occasions."  *Id.* at 779.  On several of these occasions, the purchaser entered the realtor's home without invitation or came up to her in public places, yelling and using profanity.  The South Carolina Supreme Court found this evidence "susceptible of the inference that the conduct complained of . . . was not a mere complaint by a dissatisfied homeowner, but was instead a continuing pattern of highly questionable conduct over a period of almost two years[,]" which supported submission of the claim for intentional infliction of emotional distress to the jury.  *Id.* at 780.

72

As many cases after *Ford* have emphasized, the second and fourth elements of the tort of outrage, the second being dispositive here, require heightened proof. *See Hansson v. Scalize Builders of S.C.*, 650 S.E.2d 68, 71 (S.C. 2007) (tracing development of the tort). This reflects a "widespread reluctance of courts to permit the tort of outrage to become a panacea for wounded feelings rather than reprehensible conduct." *Id.* at 71 (quoting *Todd v. S.C. Farm Bureau Mut. Ins. Co.*, 321 S.E.2d 602, 611 (S.C. Ct. App. 1984), *rev'd on other grounds*, 336 S.E.2d 472 (S.C. 1985)).

It is for this same reason that the court acts as a gatekeeper by deciding, in the first instance, "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and only where reasonable persons might differ is the question one for the jury." *Id.* at 71 (internal citation and quotation marks omitted). Numerous appellate decisions affirm dismissal of outrage claims for failure of this element. *See, e.g., Williams v. Lancaster County School Dist.*, 631 S.E.2d 286, 304 (S.C. Ct. App. 2006) (finding parents' allegations against principal and school district relating to actions that affected their children's grades or class ranks could not be characterized as extreme and outrageous); *Gattison v. S.C. State College*, 456 S.E.2d 414 (S.C. Ct. App. 1995) (university employee failed to establish sufficiently outrageous conduct despite evidence his supervisor falsely accused employee of misplacing documents, taunted him, and told employee college was going to fire him); *Shipman v. Glenn,* 443 S.E.2d 921 (S.C. Ct. App. 1994) (holding supervisor's conduct in ridiculing speech impediment and then threatening to fire employee with cerebral palsy was not sufficient to support claim of outrage); *Todd*, 321 S.E.2d 612 (holding actions of independent contractor hired by employer, which included lying and requiring employee to take a voice stress test that was later determined to be in violation of state law, did not satisfy

73

necessary threshold because violation of the state statute "does not import moral turpitude or outrageousness" and "lying, in and of itself, [is not] outrageous conduct").

In deciding whether DeCecco's collective allegations against the Smiths present facts sufficient that a reasonable jury could find their individual or collective conduct "so extreme and outrageous as to exceed all possible bounds of decency [such that they] must be regarded as atrocious, and utterly intolerable in a civilized community[,]" the court views the allegations in the context in which they arose:  interactions between a college athlete and her coaches.  While decided in the context of Title IX and Section 1983 claims, *Jennings* is of some significance here as the court analyzed the facts "tak[ing] into account the informal, sometimes jocular, college sports team atmosphere[,]" which may include "off-color language [or conduct] that is not aimed to degrade or intimidate."  *Jennings*, 482 F.3d at 698.

It is against this backdrop that the court views DeCecco's claim for intentional infliction of emotional distress.  The three most serious allegations are Jamie Smith's actions with respect to the Locker Room Incident, Shelley Smith's later inquiry of how DeCecco could live with herself knowing she would not be played, and Jamie Smith's alleged threat that bad things would happen if DeCecco appealed her scholarship reduction.  As to the Locker Room Incident, the ambiguity of the comments and touch prevent a finding that the conduct was sufficiently extreme or outrageous to satisfy the relevant standard.   Likewise, while Shelley Smith's inquiry was phrased in a manner that may have been unnecessarily harsh, it was not so far beyond the bounds of acceptable player-coach interactions as to exceed all possible bounds of decency.  The same is true as to Jamie Smith's statement that bad things might happen if DeCecco appealed.   While this alleged threat was sufficiently ambiguous that it might have been construed as physically threatening, there is no evidence that Jamie Smith intended it to be so construed or otherwise intended it to cause emotional

distress (as opposed to dissuading DeCecco from filing or pursuing an appeal). Further, even if the threat violated college sports regulations, such a violation is not enough to establish extreme and outrageous conduct. *See generally Todd*, 321 S.E.2d 612 (finding lying and violation of statute intended to protect employees did not support outrage claim). The other alleged actions are of less severity and, even collectively, cannot be viewed as "so extreme and outrageous as to exceed all possible bounds of decency." DeCecco's outrage claim, therefore, fails as a matter of law.[53]

### D.     Negligence against the Smith Defendants

As noted above, the negligence claim asserted against the Smith Defendants is also asserted against Hyman and Girton. This section of the order addresses this negligence claim (the fourth cause of action) only as it relates to the Smith Defendants.

**Official Capacity Immunity.** To the extent sued in their official capacity, the Smiths are immune from suit under this (tort) cause of action for the same reasons explained as to Hyman and Girton: in their official capacity they are USC, and USC is immune from suit under the Eleventh Amendment.

**Individual Capacity Immunity.** To the extent sued in their individual capacity, the Smiths are immune from suit under the SCTCA unless they: (1) acted outside the scope of their

---

[53] The court also notes that a number of DeCecco's allegations of improper conduct cannot properly be relied on in support of an outrage claim because they would be actionable under another tort such as assault, battery, or defamation. *See Todd*, 321 S.E.2d at 613 ("The tort of outrage was designed not as a replacement for the existing tort actions. Rather, it was conceived as a remedy for tortious conduct where no remedy previously existed. Here, an action for defamation, which is the usual remedy to be employed against one who has published falsehoods, is available to Todd."). This would apply to DeCecco's allegations regarding touching in the coaches' locker room (battery), the threat that bad things would happen (assault), or any accusation that she was homosexual (defamation). Exclusion of these allegations from consideration would further weaken the second element of DeCecco's outrage claim.

employment; or (2) committed actual fraud or acted with actual malice, intent to harm, or committed a crime involving moral turpitude.[54]

**Shelley Smith.** The negligence allegations against Shelley Smith are founded on her alleged failure to protect DeCecco from Jamie Smith.[55] To the extent Shelley Smith had such a duty, her obligation arose from her duties as head coach.[56] The difficulty for DeCecco is that such a duty would fall within the scope of Shelley Smith's employment, providing her with immunity from suit absent evidence she "committed actual fraud or acted with actual malice, intent to harm, or committed a crime involving moral turpitude." Nothing in the complaint suggests such a basis for the negligence claim against Shelley Smith. It follows that the SCTCA provides Shelley Smith immunity from suit for negligence in her individual capacity.

**Jamie Smith.** DeCecco's only arguments that any of Jamie Smith's challenged actions were outside the scope of his employment relate to the Locker Room Incident and the threat that bad

---

[54] The second exception to immunity is to some degree inconsistent with a claim for negligence, as the conduct addressed, particularly fraud and actions intended to cause harm, would normally be actionable as an intentional tort, rather than under a negligence theory. The Smith Defendants do not argue for immunity under the intentional infliction of emotional distress or fraud claims, presumably because of the second exception.

[55] Although the complaint includes allegations that Shelley Smith acted with an intent to harm DeCecco, those allegations are not referenced under or relevant to DeCecco's negligence claim to the extent asserted against Shelley Smith.

[56] In moving for summary judgment, the Smith Defendants noted the absence of any basis for imposing a duty on them with respect to the negligence claim. Dkt. No. 130-1 at 27 (as to Shelley Smith); *id.* at 28 (as to Jamie Smith). They further noted that most of the allegations against Jamie Smith related to harassing conduct which suggested intentional conduct rather than conduct based on a duty of due care. In her response to the Smiths' motion, as in her response to the USC Defendants' motion, DeCecco erroneously relies on the SCTCA as *creating* a duty of due care. As explained above (Discussion § I.C.), the SCTCA merely incorporates common law duties, leaving it to DeCecco to identify the source of the duty or duties on which she relies. Despite her failure to identify *any* duty, the court has assumed that some duties might arise from the Smiths' employment. Even with this assumption, the claim fails for reasons addressed below.

76

things would happen if DeCecco appealed. If intended for the purpose of obtaining sexual favors, Jamie Smith's comments in the coaches' locker room would fall outside the scope of his employment. Although less clear, Jamie Smith's "bad things" threat might also fall outside the scope of his employment if intended primarily to cause DeCecco emotional harm (fear) or to protect the Smiths' personal interests. Proof of such intent would, however, take the alleged wrongs outside the scope of a negligence claim.[57]

**Conclusion as to Negligence.** The Smiths are, therefore, immune from suit on the negligence claim under the Eleventh Amendment to the extent sued in their official capacity. To the extent sued in their individual capacity, they are immune from suit on the negligence claim under the SCTCA because no allegation supporting a claim for negligence (as opposed to an intentional tort) would fall outside the scope of their employment.

### E.    Fraud against the Smith Defendants

The fraud cause of action is asserted solely against the Smith Defendants, and, presumably, solely in their individual capacity.[58] As noted above, this claim is limited to allegations that the Smith Defendants made false statements regarding whether they had taken action to seek redshirt status for DeCecco. To the extent DeCecco now argues that the Smith Defendants also committed fraud with respect to her scholarship offer, her claim is barred for failure to raise it in the complaint. *See generally* Fed. R. Civ. P. 9 (requiring fraud be pleaded with particularity).

---

[57] DeCecco conceded this point at oral argument. She has not, in any event, suggested any basis of a duty of due care which would support a negligence claim based on either instance of alleged misconduct by Jamie Smith.

[58] The nature of this claim (actual fraud) causes it to fall outside the SCTCA's individual immunity protections. If sued in their official capacity, the Smiths would be immune from suit as to this claim under the Eleventh Amendment.

To prove fraud, DeCecco must establish the following nine elements: "(1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury." *Turner v. Milliman*, 708 S.E.2d 766, 769 (S.C. 2011).

In her Verified Complaint, DeCecco alleged that the Smith Defendants "told [her] they had applied for *and she was receiving* a redshirt for the 2009 season." Dkt. No. 1 ¶ 219 (fraud claim). In her deposition, DeCecco testified that she asked for a redshirt by mid-September 2009. P. dep. at 248:16-25; *id.* at 342:1-5. This request was made first of Jamie Smith and then of both coaches. P. dep. at 249:1-21. Jamie Smith said "he would look into it, look into the details for [her]." *Id.* at 249: 11-12. DeCecco inquired again later as to the redshirt status and the coaches responded that they "didn't know." P. dep. at 249:13-16. At the end of the season, Shelley Smith suggested DeCecco contact Jamie Funk, who was responsible for NCAA Compliance. P. dep. at 249:22-250:21. Funk informed DeCecco that no redshirt request had ever been made and she could not then apply for a redshirt because she had played during the season. P. dep at 251:4-14. DeCecco's father also testified that, during the July 29, 2010 meeting, Coach Jamie Smith admitted that he promised DeCecco a redshirt. C. DeCecco dep. at 12:3-10.

For purposes of this order, the court assumes that this evidence is sufficient to support a finding that one or both of the Smiths promised to at least look into obtaining redshirt status for DeCecco when she requested that status after the start of the 2009 season, later responded to inquiries in a manner that suggested they had initiated the process, but, in fact, never took action to pursue redshirt status for DeCecco. The court further assumes without deciding that DeCecco has

shown evidence of injury in the loss of a year of eligibility even though she still has at least two years of eligibility remaining and no immediate plans to use that eligibility.[59]

DeCecco's claim fails even with these favorable assumptions because her injury must flow from the false representation, not simply from the loss of redshirt status. This would require DeCecco to show that, but for a false promise to take action, she could have done something else, which would have allowed her to obtain redshirt status or otherwise avoid the resulting injury. Such evidence is relevant to several of the elements of a fraud claim including whether the false statement was material, whether the Smiths intended DeCecco to act on the representation, whether DeCecco relied on it, and whether she suffered an injury based on her *reliance on the false representation*. DeCecco argues that she relied on her coaches in that she "depended on their representations." She has not, however, suggested materiality, reliance, or resulting injury in the legal sense because she has not identified any other action she could or would have taken which might have provided her the desired result had the Smiths not given the alleged false assurance.[60] DeCecco also fails to present

---

[59] The Smiths argue that DeCecco has no injury because she has not used what eligibility she has remaining. For present purposes, the court assumes this goes to the extent, rather than existence of, an injury.

[60] The Smiths argue, *inter alia*, that DeCecco's evidence suggests only a promise to seek, not a promise to obtain, redshirt status. They further argue that DeCecco has failed to present evidence that the alleged promise was material or that the Smiths intended DeCecco to act on the alleged promise. Dkt. No. 130-1 at 31. In her response, DeCecco refers to both the redshirt promise and the scholarship promise. The latter is irrelevant for reasons addressed above. As to the redshirt promise, DeCecco maintains that she has presented evidence of a promise because "she requested such from the Smith Defendants 'right after' the beginning of her Sophomore year." Dkt. No. 150 at 32. She further asserts that the Smiths "assured [her] that they would 'look into it for [her'] and like any trusting teenager, Miss DeCecco depended on their representation." *Id.* She then proceeds to discuss reasonableness of reliance. That DeCecco may have "depended" on the Smith's assurance in a general sense is not, however, the sort of "reliance" required to support a claim of fraud given the absence of evidence that she changed her position in some detrimental way based on the reliance. In any event, she conceded in her deposition that, when she followed up, the Smiths stated that the "didn't know" the status of the request. P. dep. at 249.

evidence that the Smiths' alleged promise to seek redshirt status was false when made, that is, that they made the statement with no intention to look into obtaining redshirt status. *See, e.g., Tom Hughes Marine, Inc. v. American Honda Motor Co., Inc.*, 219 F.3d 321 (4th. Cir. 2000) (noting that, under South Carolina law, the mere failure to keep a promise is not actionable as fraud). DeCecco's claim for fraud, therefore, fails.

**F.     Punitive Damages**

As noted above, DeCecco's claim for punitive damages does not assert an independent cause of action. Instead, it suggests a potential basis for punitive damages if she establishes liability under one or more of her other causes of action. As none of DeCecco's substantive claims survive, her claim for punitive damages also fails.

**G.     Conclusion as to Smith Defendants**

For the reasons set forth above, the Smith Defendants' motion for summary judgment is granted in full, albeit not on all grounds argued.

## CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment are granted in full, albeit not on all grounds argued, and the remaining evidentiary motions are rendered moot.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
January 16, 2013